WRIGHT *v.* AARON.

4-8626                                 215 S. W. 2d 725

Opinion delivered December 6, 1948.

Rehearing denied January 10, 1949.

*Ras Priest*, for appellant.

*D. Leonard Lingo* and *Harry Ponder, Jr.*, for appellee.

Ed. F. McFaddin, Justice. Appellant Roy Wright owned a liquor store at Swifton, Jackson County, which was burglarized on the night of June 10, 1947; and this appeal stems from his efforts to recover the value of the stolen liquor.

Jerry Capes owned and operated a pool hall[1] in Hoxie, Lawrence County. He left Hoxie shortly after midnight on June 26, 1947, but his pool hall continued to be operated under the supervision of an employe named Charles Prentice. Wright became suspicious that Capes and a man named Brown were implicated in the liquor store theft, and on July 7th Wright filed—in Jackson County—criminal proceedings against Capes

---

[1] "Pool hall" is not listed in Webster's Dictionary. The word given is "poolroom"; but the adjudicated cases and annotations hereinafter cited under Topic II have used the words "pool hall," so that we believe the expressions "poolroom" and "pool hall" have become synonymous by usage.

and Brown, charging them with the crimes of burglary and grand larceny. The same day—July 7th—a man named George Jackson appeared at the Capes pool hall in Hoxie exhibiting a bill of sale conveying the pool hall from Jerry Capes to George Jackson. Charles Prentice considered the instrument to be genuine, and agreed to find some local person to buy the pool hall from Jackson. In a few hours Prentice had interested appellee, Edwin Aaron, in purchasing the pool hall for $2,000 cash.

The same day Jackson and Aaron went to the office of D. Leonard Lingo, an attorney in Walnut Ridge, Lawrence County, to have him prepare the necessary papers. While they were at the attorney's office, Wright and his detective arrived and questioned Jackson at considerable length. The Sheriff of Lawrence County, an agent of the Federal Bureau of Investigation, and several others were called into the questioning. The entire conference in Lingo's office lasted about twelve hours, concluding about 2:00 a. m., July 8th. Wright was trying to locate the whereabouts of Capes and Brown, and to get the $2,000 that Aaron was to pay Jackson for the pool hall. The evidence reflects considerable misunderstanding on this last item; but Aaron did finally pay Jackson the $2,000 and received a bill of sale and possession of the pool hall. Jackson left Lawrence county on July 8th or 9th, and has not been subsequently located.

On July 11, 1947—three days after Aaron had paid his money and obtained possession of the pool hall—Wright filed an action in the Lawrence Circuit Court against Capes and Brown for $2,000 [2] as the value of the liquor alleged to have been stolen by them from Wright's liquor store. An automobile was attached as belonging to Brown, and the pool hall was attached as belonging to Capes. Aaron was not made a defendant in the original attachment action, but was added as a defendant on September 25th when Wright filed an amended complaint and motion to transfer to equity. In this last-mentioned pleading Wright claimed (1) that Aaron was

[2] This amount was subsequently amended to be $2,476.39.

not an innocent purchaser of the pool hall, but was a party to the fraudulent scheme of Capes and Jackson to remove Capes' property from the State for the purpose of hindering, delaying and defrauding creditors; and (2) that Aaron had failed to comply with the bulk sales law in purchasing the pool hall, and was liable as a receiver. The prayer—insofar as concerned Aaron—was that Wright's attachment be sustained as prior to Aaron's purchase, or—in the alternative—that Aaron be held to be a receiver under the bulk sales law.

Aaron's defense was that his purchase and possession were prior to the attachment, and that he was an innocent purchaser for value and without fraudulent intent. He denied that the bulk sales law applied to the transaction. The cause was transferred to the chancery court, and resulted in a finding and decree in favor of Aaron and against Wright insofar as the pool hall was concerned. From that decree Wright has appealed. Aaron is the only appellee in this court. Two contentions are presented by Wright. These are: (1) that Aaron was not an innocent purchaser in good faith and without fraudulent intent, and (2) that Aaron should be held as a receiver under the bulk sales law. We proceed to discuss these.

1. *Aaron's Purchase.* The applicable rules of law, in a case such as this one, were stated by Mr. Justice WALKER in *Galbreath* v. *Cook,* 30 Ark. 417:

"It may be considered as settled in this court that when a party purchases property and pays for it a fair price, and without knowledge of the failing circumstances of the debtor, or of his intent to defraud his creditors, he will be protected in his purchase. *Splawn* v. *Martin,* 17 Ark. 146, and *Christian* v. *Greenwood,* 23 Ark. 258, 79 Am. Dec. 104.

.    .    .    .    .

"But if the purchaser has notice of the fraud and deals with the vendor, and by so doing aids him in the perpetration of a fraud upon his creditors, then, even if a full price is paid by him, he can assert no claim to equitable relief. . . .

"Thus we see that in order to protect the purchaser in his property, it is not alone necessary that he should be an innocent purchaser, but that he should also have paid a consideration for the property. These combined protect him; if either is wanting he must fail."

Furthermore, in *Splawn* v. *Martin,* 17 Ark. 146, Mr. Justice HANLY said: "Now it is the *intent* that makes a conveyance fraudulent as to creditors, and this *intent* must be *participated* in by both parties. See *Peck* v. *Carmichael,* 9 Yerg. Rep. 325, 328; *Trotter* v. *Watson,* 6 Hump. Rep. 509; *Jones* v. *Read,* 1 Ib. 335; *Farmers Bank et al.* v. *Douglass et al.,* 11 S. & M. (Miss.) Rep. 469; *Dardenne* v. *Hardwick,* 4 Eng. Rep. 482."

That Aaron paid the full sum of $2,000 is not disputed, but Wright claims that Aaron paid either (1) with knowledge of the Capes-Jackson fraudulent intent to hinder, delay or defraud creditors, or (2) with notice of facts which would require a reasonably prudent man to inquire, and which inquiry—if pursued—would have led to knowledge of the Capes-Jackson fraudulent intent. See *Rosewater* v. *Schwab Clothing Co.,* 58 Ark. 446, 25 S. W. 73. The burden was on Wright to prove the knowledge or notice of Aaron of the fraudulent scheme of Capes and Jackson. See *Rosewater* v. *Schwab, supra.*

With the applicable rules of law understood, the question now under consideration becomes: Did Aaron at the time of the purchase and payment have knowledge of the fraudulent intent of Capes and Jackson, or—if not knowledge—did Aaron have notice of such facts which would put a reasonably prudent man upon inquiry and which inquiry—if pursued—would have led to knowledge of the Capes-Jackson fraudulent intent? The chancery court by its decree necessarily answered this question in the negative; and we examine to see if that finding is against the preponderance of the evidence. Of course, if we decided this case under the old adage that "hindsight is better than foresight," then we would hold that Aaron dealt with a group of "smooth crooks"[3] when he purchased the pool hall, and that he

[3] The chancery court sustained the attachment against Brown's automobile and rendered judgment *in rem* against the car for Wright's judgment for the stolen liquor. From information which the F.B.I.

should have protected himself by seeing that the $2,000 he paid Jackson was held to await the filing and outcome of the Wright-Capes litigation. But the question of Aaron's good faith and *bona fide* purchase must be judged by the circumstances and facts as they existed and appeared when he paid the money and took the bill of sale and obtained possession of the pool hall. That he paid $2,000 cash on the advice of his attorney is not denied, nor is it suggested that the solicitation of legal advice was a cloak. It is not denied that Jackson had authority from Jerry Capes (alias Raymond Gestes) to make the sale of the pool hall. At the penalty of prolonging the opinion, we set out some of the salient testimony.

(A) Charles Prentice, the man who operated the pool hall for Jerry Capes, testified that on July 7th George Jackson came in the pool hall, and showed Prentice a bill of sale from Capes to Jackson. Said Prentice:

"A. I looked over the bill of sale, and I figured it was genuine, . . . . And he (Jackson) asked me could I sell it (the pool hall) at that time; and right at that time the men that had charge of the building wouldn't give a lease on it for any length of time, . . . And then I explained to him about the lease and how it might knock out the sale. Q. What fee did he agree to pay you if you could sell it? A. One hundred and fifty dollars ($150). Q. Did you get in touch with any prospective buyers? A. Yes, I first went to a friend in Hoxie. Q. Who was this man? A. Jim Turner; . . . Q. But he didn't buy it? A. No. Q. Whom else did you contact? A. I called Mr. Aaron here, . . ."

.    .    .    .

obtained from Jackson, Capes was duly apprehended in Oklahoma. It developed that his real name was Raymond Gestes, and that Brown's real name was Dale Gestes. Raymond Gestes had married Jackson's daughter in Oklahoma. Raymond Gestes was apprehended in Oklahoma and did not confess to the liquor store robbery, but was taken to Colorado to answer for a previous offense where—under the name of Charles Wilson—he pleaded guilty to a federal offense and was sentenced to prison. At the time of the chancery trial he was in a Federal prison in Texas. Dale Gestes—alias Brown—was still at large at said time. Jackson seems to have been too unimportant to arouse further investigation. In this opinion we continue to refer to the parties as "Capes" and "Brown."

"Q. During the eighteen (18) months you were associated with Jerry Capes, was it common for him to go off on trips and be gone for a few days at a time? A. Yes. Q. Did that happen frequently? A. All along, yes. Q. Do you know whether or not Jerry Capes in the months immediately prior to leaving here was secretary and treasurer to the Young Business Men's Association or Club at Hoxie—whether he filled in the cards and took care of the secretarial business of the club and handled the money? A. Yes, he was, and he did that."

"Q. You never did know whether or not Jerry Capes was a fugitive while he was here, and never did know why he was here? A. Oh, no, sir, I sure didn't."

(B) Appellee Aaron testified that he paid Jackson two thousand dollars for the pool hall. Said he:

"Q. How did you first come in contact with him (Jackson)? A. Mr. Charlie Prentice worked down there, and he learned that they were going to sell it, and he called me; I have a boy that has been wanting something like that to do, and I went down and got hold of the fellow, and we made a deal. Q. Did you discuss it? A. Yes, he wanted to sell it higher, and we talked around a while, and I got him down some. Q. How long did you negotiate on this trade? A. Why, just a few minutes; we talked for a short time. Q. And two thousand dollars ($2,000) was agreed on finally? A. Yes. Q. Before you traded with him did he show you any evidence that he owned it? A. He showed me a bill of sale. Q. Who was it from? A. It was from Jerry Capes to Mr. Jackson. Q. Were you acquainted with Jerry Capes—the boy who went by that name in Hoxie? A. Yes, sir. Q. After you and Jackson reached the trade, what did you do? A. Before we traded I talked to him, and then Mr. Prentice asked was anything owed on the pool hall and was everything in the clear, and he said it was all clear and nothing owing on it, and we went around to Mr. Lingo's to draw up another bill of sale, and we made the trade. Q. Did you buy that with the intent to defraud Roy Wright out of any money or anything like that? A. No, I wouldn't do that; Roy and I have known each

other a long time. I wouldn't have done anything like that at all. Q. You bought it in good faith? A. Sure. Q. And you are an innocent purchaser? A. Yes. Three or four others would have bought it, but they wanted the lease on the building for at least a year, and the man that owns the building wouldn't give it. I didn't get the first chance on it even at that. Q. Do you know whether Jerry Capes was the secretary and treasurer of the Business Men's Club down at Hoxie A. Yes."

. . . . .

"Q. He was elected to that position? A. Yes, the people elected him."

(C) Aaron consulted three reputable attorneys before he paid his money to Jackson, and he acted on their advice. Here is a portion of his testimony in that regard:

"BY MR. LINGO: Q. Did you talk to Harry L. Ponder, Sr., about the matter? A. Yes, about the deal, I did. Q. Anybody else? A. Both the Harries [4]—big and little Harry—and to you. Q. To me? A. Yes. Q. What advice did they give you? A. They told me the only way that anything could be wrong would be that I would have to be connected with the robbery of the Whiskey store—that they couldn't take anything from me. Q. Did you hear any discussion between Jackson, Swindle and Wright about placing this money in escrow? [5] A. They said they were going to put it in the bank. Q. Was that your information that night? A. Yes. Q. Did you go home believing that that was what they were going to do? A. Yes, sir."

. . . . .

"Q. It was your understanding and belief that they would take the proceeds of this sale and put it in the bank and hold it in escrow (5) in the bank, pending the outcome of this suit? A. Yes, sir. Q. And that was what you understood? A. Yes, sir."

---

[4] The reference is to Hon. Harry L. Ponder, now deceased, and to his son, Hon. Harry L. Ponder, II.

[5] This would not have been a legal escrow, but a method of dealing with the proceeds of the sale.

(D) Sheriff Joe Spades of Lawrence county—who attended some of the conferences in Attorney Lingo's office—testified that Jackson remained in Walnut Ridge until some time the next day and came to Spade and asked if it was all right for Jackson to leave.

From all of the above, and other evidence in the record, it is clear that Aaron understood that it was agreeable to Wright for Aaron to pay the money to Jackson and leave to Wright and Jackson the details of handling the money. From the testimony heretofore detailed, and the other in the record, we cannot say that the Chancery Court erred in holding—as it impliedly did—that the evidence was insufficient to show Aaron to have intent to defraud Wright. So we affirm the Chancery Court on that issue.

II. *The Bulk Sales Law.* Appellant says that since Aaron did not comply with the bulk sales law (§ 6067, *et seq.,* Pope's Digest) when he purchased the pool hall from Jackson, he is liable as a receiver under the provision of that law. Aaron's defense is that the bulk sales law does not apply to the sale of a pool hall. The appellant cites *N. M. Uri & Co.* v. *McCroskey,* 135 Ark. 537, 205 S. W. 976; but that case is not in point, for, there, the court considered the rights of creditors without saying or holding that a "billiard hall," independent of a confectionery, was within the purview of the bulk sales law. We have no Arkansas case deciding the question here posed—whether a pool hall is within the purview of the bulk sales law.[6] A sawmill, repair shop, restaurant, electrical business and wholesale bakery was each the respective subject of consideration in the following cases. *Ramey-Milburn Co.* v. *Sevick,* 159 Ark. 358, 252 S. W. 20; *Fisk Rubber Co.* v. *Hinson,* 168 Ark. 418, 270 S. W. 605; *D. C. Goff Co.* v. *First State Bank,* 175 Ark. 158, 298 S. W. 884; *Wellston Radio Corp.* v. *Culberson,* 175 Ark. 921, 300 S. W. 443; *Gretzinger* v. *Wynne Wholesale Grocery Co.,* 183 Ark. 303, 35 S. W. 2d 604.

---

[6] The case is not briefed on the point of whether the holder of an unliquidated tort action is a creditor within the purview of the bulk sales law, so we treat that issue as not being before us in this controversy.

What was said about a restaurant in *Goff* v. *State Bank, supra,* applies with equal force to the pool hall situation now before us: "Clearly, we think, a keeper of a restaurant, whose business is to serve food and drink to the public, is not engaged in the mercantile or merchandising business, nor is he a merchant, within the meaning of the bulk sales law. Even though he may keep some merchandise which is used or useful in his business, including cigars and cold drinks, still we are of the opinion that this does not change the character of the business, but is only incidental thereto."

Here, the pool hall had tables, balls and cues for use by the public. It is true that tobacco, candy and cold drinks were sold, but these sales were only incidental to encouraging the public to play pool. Cases from other jurisdictions hold that a pool hall is not within the purview of the bulk sales law. *Ferrat* v. *Adamson,* 53 Mont. 172, 163 Pac. 112; *McPartin* v. *Clarkson,* 240 Mich. 390, 215 N. W. 338, 54 A. L. R. 1535; *Independent Breweries* v. *Lawton,* 200 Mo. App. 238, 204 S. W. 730. See also annotations in 7 A. L. R. 1589, 54 A. L. R. 1538, and 168 A. L. R. 781.

We reach the conclusion that the chancery court was correct in refusing to hold Aaron liable under the bulk sales law; and, finding no error in any other regard, we affirm the decree of the chancery court in all things.