STATE of Arkansas *v.* Albert BELL

CR 96-1543                                948 S.W.2d 557

Supreme Court of Arkansas
Opinion delivered July 14, 1997
[Petition for rehearing denied September 11, 1997.*]

---

* GLAZE, J., would grant.

*Winston Bryant*, Att'y Gen., by: *Vada Berger*, Asst. Att'y Gen., for appellant.

*J. W. Green, Jr.*, for appellee.

ROBERT L. BROWN, Justice. This is the second appeal relating to the judgments of conviction of Albert Bell. Terry Sims and Albert Bell gave statements to law enforcement officers confessing to the murders of Julian Russell and Mary Lou Jones at Cloud's Grocery Store in Casscoe, Arkansas County. At the ensuing trial of Albert Bell, he was convicted of both murders and sentenced to two consecutive life sentences. We remanded for the limited purpose of a new suppression hearing because the prosecutor failed to make available State Police Sergeant Gary Allen, who allegedly played "bad cop" to Officer John McCord's "good cop" in the

police interrogation of Bell. *See Bell v. State*, 324 Ark. 258, 920 S.W.2d 821 (1996). We said in this decision that a new trial would only be warranted in the event that Bell's statement was suppressed by the trial court on remand. Bell's remaining points on appeal were rejected by this court.

Following the remand, Bell filed an amendment to his motion to suppress. In the motion, Bell complained that he was not allowed to consult with counsel despite requesting to speak with an attorney and, further, was not allowed to consult his parents. Bell also complained "[t]hat each of the statements was taken in violation of the *Arkansas Rules of Criminal Procedure*, specifically *Rules* 2.2 through 3.5." At the suppression hearing on remand, State Police Investigator John McCord testified that he first spoke with Bell, who was age 16, on January 5, 1993. Officer McCord testified that on that day, he and State Police Officer Lloyd Franklin waited at the Stuttgart High School for Bell to be dismissed from class. He testified that he had told Bell in the principal's office that he did not have to go to the Arkansas County Sheriff's Department with them. When school was out, the police officers called Bell and Sims over to an unmarked police car and placed them in the back seat. They then drove the two young men to the sheriff's department for questioning. After leaving the high school, Officer McCord did not tell Bell again that he was free to leave.

Bell's interview at the sheriff's department took about 30 minutes and his mother was with him during the interview. Officer McCord testified that Bell was not a suspect at this time and was free to leave. He admitted that Sims left the sheriff's department during this time and was chased by police officers. It was later revealed that Sims returned on his own. Officer McCord testified that he did not read Bell his *Miranda* warnings at this time because Bell was not a suspect. Rather, he questioned Bell because Bell was a friend of Sims and because Bell had been seen near the store about the time of the murders. Bell denied being with Sims on the day of the murders.

Deputy Sheriff David Box testified that he was instructed to locate Bell on January 8, 1993, and bring him to the sheriff's

department for questioning. He found Sims and Bell at Bell's grandmother's house, but they were not placed under arrest or handcuffed. Deputy Box testified that if the two young men had refused to go with him, he would have radioed the sheriff for instructions. He admitted that he did not tell Sims and Bell that they did not have to accompany him.

Officer McCord testified that he interviewed Bell a second time on January 8, 1993, but this time Bell was considered a suspect. He testified that the investigation began to focus on Sims on January 5, 1993, because Sims had given inconsistent times when he returned a videotape to Cloud's Grocery Store. The state police officer also stated that Sims's neighbor was missing a .22 revolver, which was the caliber of the gun used in the Casscoe murders. He added that Bell acknowledged he understood his *Miranda* rights on January 8, 1993; that he agreed to speak with him; and that he initialed the separate *Miranda* warnings and signed the waiver of rights form. In the first statement taken from Bell on January 8, 1993, Bell repeatedly denied that he was with Sims on the night of the murders. However, Officer McCord knew that Eddrick Bell, Albert Bell's brother, on the previous day had placed Bell with Sims on the night in question. Eddrick Bell told the police officers that Sims had picked up Bell at about 7:00 p.m. that evening. When confronted with this statement, Bell admitted that he had been with Sims and that he accompanied Sims to Cloud's Grocery Store. He further told the interrogating officers that he sat in the car and saw Jeanette Gillmore shoot Julian Russell in the grocery store and that Sims ran out of the store while the shooting was in progress.

Officer McCord related at the hearing that Bell never asked to stop the questioning or to terminate the interview on January 8, 1993, and that he never asked for a lawyer. He estimated that he talked with Bell for an hour or less. After the police officer completed his interview, Bell was turned over to State Police Investigator John Howell for a polygraph examination.

Officer John Howell explained at the suppression hearing that Bell agreed to take the polygraph exam. He testified that he inquired about Bell's statement that a Jeanette Gillmore had done

the shooting, but Officer Howell stated that the polygraph test showed that Bell was being deceptive with his answers. Bell told Officer Howell that he would tell the truth if allowed to speak with Sims first. He was told that he could talk to Sims only after he told the truth. Bell then told Officer Howell that Sims shot the victims: "Terry just lost it and started shooting." Bell wanted to make a plea at that time, and Officer Howell informed him that only the prosecuting attorney had the authority to agree to a plea. Bell was allowed to speak with Sims, and he told Sims that he was going to tell the truth "regardless of what Terry had to say." Sims then agreed to tell the truth, and he confessed to shooting the two victims.

Officer John McCord had first testified that he did not believe he had probable cause to arrest Bell on January 8, 1993. When he retook the stand at a later date, he testified that it was "borderline" but he thought there was probable cause to arrest on January 8, 1993.

State police sergeant Gary Allen testified that he "sat in" on the January 8, 1993 interrogation. He denied that he conducted the interview or threatened or coerced Bell to make a statement. He did admit to telling Bell that he was lying.

Bell took the stand at the suppression hearing, as did his parents, who testified that they were excluded from the January 8, 1993 interview. Bell denied that he knew what a *Miranda* right was. He admitted that he had a juvenile offender history but denied that he had ever been read his *Miranda* rights previously. He stated that he had since learned of his rights in prison. Bell admitted that Officer McCord read him his rights on January 8, 1993, but he stated that Officer McCord did not explain what those rights meant. Bell admitted that he initialed the paragraphs on the waiver form and signed it because he was told to do so. He further stated that he requested an attorney. He did not think he could leave on January 8 because the police officers had chased Sims when he left the sheriff's department on January 5.

On cross-examination, Bell admitted that he was told that he had the right to remain silent, but he felt compelled to answer the questions that were being asked to him. He further testified that

he had heard *Miranda* warnings read in television programs but revealed that he did not understand them. Bell admitted that he did not ask for an explanation of his rights. He also indicated that at least some of his rights had been explained to him as a juvenile. Bell added that while he understood the words of the warnings, he did not understand what they meant.

The trial court entered its order and concluded that Rule 2.3 was not complied with when Bell was picked up from high school for questioning on January 5, 1993. Moreover, he was not advised of his *Miranda* rights on that date. The trial court observed that Rule 2.3 was also not complied with when Bell was picked up for questioning on January 8, 1993. Nor, according to the trial court, did police officers have probable cause to arrest him at that time. The court then stated:

> The record does not reflect any effort taken by the state to comply with Rule 2.3 nor any efforts by the state to determine whether the waiver executed by the defendant was made with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them.

However, the court agreed that Bell had acknowledged that he understood his rights when they were read to him.

The court suppressed the statements made by Bell on both January 5 and January 8, 1993, and the State has appealed that order.

## I. Rule 2.3

The State first disagrees that a violation of Ark. R. Crim. P. 2.3 transpired. Rule 2.3 states:

> If a law enforcement officer acting pursuant to this rule requests any person to come to or remain at a police station, prosecuting attorney's office or other similar place, *he shall take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request.*

Ark. R. Crim. P. 2.3 (emphasis added). The State makes three arguments under this point on appeal: (1) the consideration of Rule 2.3 was barred by the law-of-the-case doctrine; (2) the trial

court erred in concluding that Rule 2.3 was violated on January 5, 1993; and (3) any violation of Rule 2.3 on January 8, 1993, was immaterial because there was probable cause to arrest Bell at that time.

### Law of the case.

The State contends that Bell was barred on remand from arguing that there was a Rule 2.3 violation because he had failed to argue that point in his first appeal. As a result, the State contends, the asserted error was barred by the doctrine of law of the case. Bell answers that the State's argument is not preserved for appeal because it was not raised in the trial court. While the State contends that the argument is jurisdictional, Bell urges that it is merely an affirmative defense.

Bell is correct that the law-of-the-case defense cannot be raised for the first time on appeal. It is undisputed that the State failed to make this argument to the trial court. Moreover, this court has previously recognized that law of the case is an affirmative defense like estoppel or *res judicata*. *See Earney v. Brantley*, 309 Ark. 190, 828 S.W.2d 832 (1992). The defense is not preserved for our review.

### Violation of Rule 2.3 on January 5, 1993.

The State next contends that the trial court overlooked the uncontroverted testimony from Officer McCord that he told Bell at the Stuttgart High School on January 5, 1993, that he did not have to accompany him to the sheriff's department. Under the bright-line rule, according to the State, this was all that was required. Bell counters with the assertion that the evidence must be viewed in his favor, and that the trial court found no such Rule 2.3 admonition was given.

We decline to address the merits of this issue because it appears patently clear that Bell did not incriminate himself with his statement on January 5, 1993. Indeed, on that day he was not a suspect, and he told police officers that he was not at Cloud's Grocery Store or with Terry Sims on the night of the murders. He was subsequently found to be lying, but no incriminating evi-

dence was obtained from Bell as a result of his interview on that date. We conclude that any error associated with the January 5, 1993 interview was harmless beyond a reasonable doubt. *See Martin v. State*, 328 Ark. 420, 944 S.W.2d 512 (1997).

*Violation of Rule 2.3 on January 8, 1993.*

■■ The State next contends that there could be no violation of Rule 2.3 on January 8, 1993, because Rule 2.3 had been complied with on January 5, 1993 and there was probable cause to arrest Bell on January 8th. Both the criminal rules and our caselaw recognize that if a police officer has probable cause to arrest, failure to give a Rule 2.3 warning is irrelevant. *See* Ark. R. Crim. P. 2.1; *see also Addison v. State*, 298 Ark. 1, 765 S.W.2d 566 (1989). Probable cause exists when there is reasonably trustworthy information within law enforcement's knowledge that would lead a person of reasonable caution to believe that a felony was committed by the person detained. *Hart v. State*, 312 Ark. 600, 852 S.W.2d 312 (1993); *Addison v. State, supra; Burks v. State*, 293 Ark. 374, 738 S.W.2d 399 (1987).

The essential facts that were available to law enforcement on January 8, 1993, were that Terry Sims had lied to them about the time he returned the movie to Cloud's Grocery Store on the day of the murders; that Sims was at the grocery store when the murders occurred; that a .22 caliber pistol was missing from the home of a friend of Sims, and that was the caliber of pistol used in the killings; that Bell told the police officers he was not with Sims after school on the day of the murders but that Bell's brother contradicted that story; that Bell's brother told law enforcement officers that just prior to the murders Sims came by to pick up Bell and that the two young men had earlier discussed returning a videotape and getting a soda; and that Bell returned a short time later with a soda pop.

■■ This court has held that the test for determining probable cause rests on the collective information of the police officers. *See Tillman v. State*, 271 Ark. 552, 609 S.W.2d 340 (1980). We further are of the opinion that the fact that Officer McCord was contradictory about whether he had probable cause

to arrest is not determinative of the issue. We conclude that this evidence was sufficient to lead a person of reasonable caution to believe that Sims had committed the killings while Bell was present. Even though "mere presence" does not make one an accomplice [*see* Ark. Code Ann. § 5-2-403 (Repl. 1993)], these facts are enough to constitute probable cause to arrest. The trial court was clearly erroneous in suppressing the January 8, 1993 statement due to the failure to give a Rule 2.3 warning and in finding that probable cause did not exist.

We further take this opportunity to state that in the future we will not interpret Ark. R. Crim. P. 2.3 to require a verbal warning of freedom to leave as a bright-line rule for determining whether a seizure of the person has occurred under the Fourth Amendment and whether a statement to police officers must be suppressed. Rather, we will view a verbal admonition of freedom to leave as one factor to be considered in our analysis of the total circumstances surrounding compliance with Rule 2.3. In short, when interpreting Rule 2.3 in the future in deciding whether a seizure of a person has transpired, we will follow *United States v. Mendenhall*, 446 U.S. 544 (1980). *See also Martin v. State*, 328 Ark. 420, 944 S.W.2d 512 (1997)(Brown, J., concurring opinion). To the extent that our decisions in *Burks v. State, supra*; *Addison v. State, supra*; *Hart v. State, supra*; *Prowell v. State*, 324 Ark. 335, 921 S.W.2d 585 (1996); and *Martin v. State*, 328 Ark. 420, 944 S.W.2d 512 (1997), state a contrary interpretation, we retreat from that interpretation.

## II.   Comprehension of Waiver

The State also contends that the circumstances prove that Bell had read and understood his *Miranda* rights on January 8, 1993, and that the trial court clearly erred in ruling otherwise. The State specifically urges that it was not required to make any special or additional effort to assess Bell's ability to understand his rights and the consequences of a waiver. We agree.

It was undisputed that Bell had been read his *Miranda* rights prior to giving the statement on this date. Bell also had some familiarity with the criminal justice system due to the fact that he

had previously been on probation as a juvenile offender. In fact, he knew that as a juvenile, he was entitled to have his parents or a lawyer present when being questioned. He was age 16 and a high school sophomore who was taking regular courses in math, science, and English, though he had also been in remedial classes since the fourth grade. He further agreed that he understood the words in his warnings but denied knowing their import.

A defendant's waiver of Fifth and Sixth Amendment rights must be knowing and intelligent with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Clay v. State*, 318 Ark. 122, 883 S.W.2d 822 (1994); *Mauppin v. State*, 309 Ark. 235, 831 S.W.2d 104 (1992). We analyze the issue of a knowing and intelligent waiver under the test of totality of the circumstances. *See Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997); *Bradford v. State*, 325 Ark. 278, 927 S.W.2d 329 (1996). Bell was 16 at the time of his confession. He was in the 10th grade and apparently on track to graduate from high school. Moreover, he had some experience with the criminal justice system, and he initialed each of his *Miranda* rights after reading them. He further agreed that he knew what the words meant.

Balanced against these factors is Bell's self-serving statement that he did not realize the consequences of a waiver. He also contends that he requested counsel, which partially flies in the face of his contention that he did not understand his *Miranda* rights.[1] While it is true that we defer to the trial court's assessment of credibility [*State v. McFadden*, 327 Ark. 16, 938 S.W.2d 797 (1997)], here the trial court provides no insight as to why it found that Bell did not understand the consequences of what he was doing. Indeed, the factors clearly preponderate in favor of a knowing and intelligent waiver. The mere statement of the accused that he did not comprehend a waiver's significance is not enough in light of his statement that he understood the words and his acknowledgment to the officers that he understood his rights.

---

[1] The trial court made no ruling on whether Bell requested counsel and that precise issue is not before us in this appeal.

We hold that the trial court clearly erred in suppressing the statement of Bell on this basis.

Because we reverse the decision of the trial court, a new trial is not warranted. *See Bell v. State, supra.* A mandate will be issued affirming the convictions and sentences in this case.

Reversed.

NEWBERN, GLAZE, and IMBER, JJ., dissent.

DAVID NEWBERN, Justice, dissenting. The decision of the Trial Court to suppress the incriminating statement given by Albert Bell to the police on January 8, 1993, rested on two alternate findings. First, the Trial Court found that the police failed to apprise Mr. Bell on January 8 that he was under no legal obligation to accompany them to the police station, that the police did not have probable cause to arrest Mr. Bell on that date, and that suppression of the statement was therefore required under Ark. R. Crim. P. 2.3. Second, the Trial Court concluded that Mr. Bell did not knowingly and intelligently waive his constitutional rights prior to making his statement on January 8 and that suppression of the statement was also required under the Fifth and Sixth Amendments to the United States Constitution. The Trial Court's decision to suppress Mr. Bell's January 8 statement was correct under our cases that have interpreted Rule 2.3 and discussed the concept of probable cause.

The rule of criminal procedure at issue in this case is Ark. R. Crim. P. 2.3. The rule was adopted by a *per curiam* order of this Court on December 22, 1975, and made effective on January 1, 1976. *See In the Matter of Rules of Criminal Procedure,* 259 Ark. 863, 530 S.W.2d 672 (1975). The rule provides as follows:

> WARNING TO PERSONS ASKED TO APPEAR AT A POLICE STATION.
>
> If a law enforcement officer acting pursuant to this rule requests any person to come to or remain at a police station, prosecuting attorney's office or other similar place, he shall take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request.

Ark. R. Crim. P. 2.3.

As we have consistently held, most recently only two months ago, a police officer who requests a person to come to the police station has a "positive duty" under Rule 2.3 to express to the person *verbally* that he or she has no legal obligation to comply with the request. *Martin v. State,* 328 Ark. 420, 429, 944 S.W.2d 512, 517 (1997). The obvious reason for the requirement is the impossibility, absent such a verbalization requirement, of administering a rule which requires that the matter be "made clear" to the person requested to accompany an officer.

Our "bright-line rule" is that "a statement must be suppressed under Rule 2.3" if the police "simply fail to notify the person" that he or she does "not have to come to the station for questioning." *Id.* However, if the police had probable cause to arrest the person at the time of the request, then suppression of the statement will not be required even if the police violate Rule 2.3. In that instance, the violation of Rule 2.3 is "excused." *Id.*

As mentioned, the Trial Court found that suppression of Mr. Bell's January 8 custodial statement was required under Rule 2.3. In reversing the Trial Court on this point, the majority appears to hedge on the initial question of whether the police in this case even violated Rule 2.3. But the majority concludes that, regardless of whether the rule was violated, it was error for the Trial Court to suppress Mr. Bell's January 8 statement because the police had probable cause to arrest him at the time they requested him to come to the police station.

In light of its ruling on the probable-cause issue, the majority determines that it is "irrelevant" whether the police violated Rule 2.3. However, the majority seizes the "opportunity" in this case to announce that, "in the future," the failure of the police to give a verbal warning will not be dispositive of the questions of "whether a seizure of the person has occurred under the Fourth Amendment and whether a statement to police officers must be suppressed." Under the majority's proposed rule, the courts would consider the police's failure to give a verbal warning as merely one factor in determining whether the police have complied with Rule 2.3. The majority says that this approach is based

upon "the constitutional rule laid down in *United States v. Mendenhall*, 446 U.S. 544 (1980)." It fashions its opinion as a "retreat" from the numerous cases that imposed the verbal–warning requirement on police officers under Rule 2.3.

The majority's analysis of Rule 2.3 is, in my view, supported by neither the law nor the facts in this case.

### 1. *The verbal-warning requirement*

The proposal to abolish the "positive duty" we have imposed on the police under Rule 2.3 is improper on procedural and substantive grounds. First, the majority opinion, by its own analysis, makes its announcement not only unnecessary to this case but "purely academic" with respect to this case. *Kapp v. Bob Sullivan Chevrolet Co.*, 234 Ark. 395, 405, 353 S.W.2d 5, 11 (1962). We consistently refuse to rule on issues that are unnecessary to our decisions. *See Shackelford v. Patterson*, 327 Ark. 172, 179, 936 S.W.2d 748, 752 (1997); *Avery v. Ward*, 326 Ark. 829, 838, 934 S.W.2d 516, 522 (1996); *Duncan v. State*, 263 Ark. 242, 244, 565 S.W.2d 1, 2 (1978); *Rogers v. Watkins*, 258 Ark. 394, 396, 525 S.W.2d 665, 667 (1975). If the majority wishes to abandon precedent and alter fundamentally the requirements of Rule 2.3, it should do so in a case in which the question of whether the rule has been violated is ripe and squarely before us.

Second, the majority proposes a dramatic change in the law of criminal procedure on the basis of a contention that the parties did not argue, brief, or in any manner present to the Trial Court or this Court. In so doing, the majority strays from our sound practice of declining to resolve legal questions that are not briefed by the parties. *See, e.g., Rider v. Cunningham*, 232 Ark. 407, 409, 337 S.W.2d 868, 869 (1960); *Union Motor Co. v. Turbiville*, 223 Ark. 92, 97 n.5, 264 S.W.2d 592, 594 n.5 (1954); *Johnson v. McAdoo*, 222 Ark. 914, 917 n.2, 263 S.W.2d 701, 703 n.2 (1954); *Wright v. Aaron*, 214 Ark. 254, 263 n.6, 215 S.W.2d 725, 729 n.6 (1948); *Avery v. State*, 15 Ark. App. 134, 139, 690 S.W.2d 732, 735 (1985) (Cracraft, C.J., concurring). In the case at bar, the State has not asked the Court to overrule our cases such as *Martin v. State, supra,* that require suppression of evidence under Rule 2.3

when the police fail to make a verbal warning and lack probable cause to arrest. The State accepts this "bright-line rule" as the law and essentially concedes that the police violated Rule 2.3 on January 8. Its only argument on appeal is that suppression of Mr. Bell's statement was improper because the police had probable cause to arrest Mr. Bell.

Third, the majority offers no persuasive rationale for departing from the principle of *stare decisis* and abandoning Rule 2.3's verbal-warning requirement. As mentioned, we held only two months ago that Rule 2.3 imposes "a 'positive duty' upon the police to inform the citizen of his or her right to refuse the request" to come to, or remain at, a police station "although the plain words of Rule 2.3 do not specifically require such a verbal notice." *Martin v. State,* 328 Ark. at 429, 944 S.W.2d at 517.

In the *Martin* case, we found that the police had requested the defendant to come to the station for questioning but had failed to give him any verbal notification that he could refuse the request. We said that "this fact alone amounted to a violation of Rule 2.3" and that the Trial Court erred by denying the motion to suppress the statement given by the defendant to the police. *Martin v. State,* 328 Ark. at 430, 944 S.W.2d at 517. We did not reverse, however, because we determined that the admission of the statement was harmless error. The State did not suggest in the *Martin* case that the police had probable cause to arrest the defendant and that his statement was properly admitted on this basis. The Court, obviously following the sound practice of not deciding issues that are not argued or briefed by the parties, therefore did not address the probable-cause issue.

We cited in the *Martin* case four other decisions from this Court imposing the verbal-warning requirement under Rule 2.3. *See Prowell v. State,* 324 Ark. 335, 921 S.W.2d 585 (1996); *Hart v. State,* 312 Ark. 600, 852 S.W.2d 312 (1993); *Addison v. State,* 298 Ark. 1, 765 S.W.2d 566 (1989); *Burks v. State,* 293 Ark. 374, 738 S.W.2d 399 (1987).

As mentioned, the majority proposes to "retreat" from these cases and analyze the "totality of the circumstances"—rather than the single question of whether a verbal warning was given—in

order to determine whether the police have violated Rule 2.3, whether a "seizure" has occurred under the Fourth Amendment, and whether a defendant's custodial statement ultimately should be suppressed. The majority asserts this approach is based upon "the constitutional rule" announced in *United States v. Mendenhall, supra.*

The observation of the majority, also espoused in the concurring opinion in the *Martin* case, is that taking a person to the police station without expressing his or her freedom not to go has been viewed as a "seizure" of the person. That is based on an erroneous view of our Rule 2.3 cases. Whatever the language in those cases may be, it is not the law that a police-citizen encounter in which the police fail to give a Rule 2.3 warning is necessarily an illegal seizure under the Fourth Amendment. The concurring justices in the *Martin* case, and the majority in this case, apparently believe our Rule 2.3 cases stand for that proposition. In the *Martin* case, the concurring justices roundly criticized the idea that an illegal Fourth Amendment seizure necessarily occurs when the police fail to give a Rule 2.3 warning. The concurring opinion cited the plurality opinion in *United States v. Mendenhall, supra,* for the proposition that a person is "seized" under the Fourth Amendment only when, considering the totality of the circumstances rather than any one factor, "a reasonable person would have believed that he was not free to leave." *Martin v. State,* 328 Ark. at 437, 944 S.W.2d at 521 (Brown, J., concurring), *quoting United States v. Mendenhall,* 446 U.S. 544, 554 (1980). The concurring opinion cited other language from the *Mendenhall* case and language from other court decisions for the proposition that whether a Fourth Amendment seizure occurs does not depend on whether a person is told that he or she is free to decline to cooperate. The concurring opinion urged that we follow these principles and reject the idea that a police officer's failure to provide a verbal Rule 2.3 warning transforms his encounter with a citizen into an illegal Fourth Amendment seizure. It made an additional, but different, suggestion that the court utilize the "totality of circumstances" test, not only to determine whether a Fourth Amendment seizure has occurred, but also to determine whether a Rule 2.3 violation has occurred.

First, it is important to understand that our cases have never held that an illegal Fourth Amendment seizure occurs when the police request a person to accompany them to the station without providing the verbal warning prescribed by Rule 2.3. To the extent that some of the language in our Rule 2.3 cases suggests otherwise, it is misleading. *See, e.g., Hart v. State,* 312 Ark. at 605, 852 S.W.2d at 315 ("Since the detectives did not comply with [Rule 2.3], there was a seizure of the appellant and a violation of his rights under the Fourth Amendment unless the detectives had probable cause to arrest him.") The definition of a Fourth Amendment seizure has long been settled by the Supreme Court and derives from the plurality opinion in the *Mendenhall* case. It is erroneous to suggest that our Rule 2.3 cases add anything to it.

Second, it is important to understand that Rule 2.3 and the Fourth Amendment impose different and independent obligations on the police. In this case, if Mr. Bell had alleged that his custodial statement on January 8 should be suppressed because it was the fruit of an illegal seizure under the Fourth Amendment, then the fact that he was not given a Rule 2.3 warning would not necessarily establish a seizure and trigger application of any exclusionary rule. If the claim is that a statement should be suppressed because it followed upon an illegal Fourth Amendment seizure, that claim is analyzed, as the majority suggests, under the "totality of the circumstances" test.

If, however, the claim is that the police requested a person not under arrest to accompany them to the station without providing the verbal warning prescribed by Rule 2.3, then our bright-line interpretation of Rule 2.3 applies. Such a claim has nothing to do with the Fourth Amendment, and thus the definition of "seizure" from the *Mendenhall* case and the "totality of the circumstances" test are inapposite.

### 2. Probable cause

The majority's recitation of facts constituting probable cause to arrest Mr. Bell is as follows:

> . . . Terry Sims had lied to them about the time he returned the movie to Cloud's Grocery Store on the day of the murders; that

Sims was at the grocery store when the murders occurred; that a .22 caliber pistol was missing from the home of a friend of Sims's, and that was the caliber of pistol used in the killings; that Bell told the police officers he was not with Sims after school on the day of the murders but that Bell's brother contradicted that story; that Bell's brother told law enforcement officers that just prior to the murders Sims came by to pick up Bell and that the two young men had earlier discussed returning a videotape and getting a soda; and that Bell returned a short time later with a soda pop.

If those are the facts that were known to State Police Investigator McCord, I suggest the officer had a pretty good understanding of the concept when he determined, as he initially testified, that he did not have probable cause to arrest Mr. Bell. Deputy Box, who was sent to pick Mr. Bell up, obviously did not think he had probable cause to arrest in view of his testimony that, had Mr. Bell refused to go with him, he would have called the sheriff's office for instructions. Far more important, the Trial Court specifically found that the officers lacked probable cause to arrest Mr. Bell.

As we have held on numerous occasions,

probable cause to arrest without a warrant exists when the facts and circumstances within the collective knowledge of the officers and of which they have reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been committed by the person to be arrested.

*Friend v. State,* 315 Ark. 143, 147, 865 S.W.2d 275, 277 (1993).

When we review a trial court's ruling on the legality of an arrest—*i.e.,* whether there was probable cause for it—we say that "all presumptions are favorable to the trial court's ruling" on the issue and that "the burden of demonstrating error" rests on the appellant. *Id.* Moreover, although "[p]robable cause to arrest without a warrant does not require the quantum of proof necessary to sustain a conviction," *Addison v. State,* 298 Ark. 1, 9, 765 S.W.2d 566, 570 (1989), "mere suspicion" does not qualify as probable cause, and "[e]ven a 'strong reason to suspect' will not suffice." *Roderick v. State,* 288 Ark. 360, 363, 705 S.W.2d 433, 435 (1986)(citations omitted). *See Rose v. State,* 294 Ark. 279,

282, 742 S.W.2d 901, 902 (1988)(stating "suspicion" will "not rise to the level of probable cause"); *Moore v. State,* 265 Ark. 20, 576 S.W.2d 211 (1979).

The State has not carried its burden of demonstrating that the Trial Court's ruling on the question of probable cause was in error. The facts recited by the majority, at best, merely give rise to a *suspicion* that Mr. Bell had committed an offense. These facts show that, by January 8, the police had reliable information connecting Mr. Sims to the murders. With respect to Mr. Bell, however, the facts justified only the belief that Mr. Bell might have been with Mr. Sims at the store around the time of the murders.

Although the "essential facts" mentioned by the majority may have given the police probable cause to believe that Mr. Bell was *present* at the store with Mr. Sims, "mere presence" at the scene of a crime is not an offense. *See also Branam v. State,* 277 Ark. 204, 207, 640 S.W.2d 445, 447 (1982)(stating the fact that appellant was seen visiting co-defendant's apartment prior to the crime does not give rise to probable cause); *Vega v. State,* 26 Ark. App. 172, 175, 762 S.W.2d 1, 2 (1988)(stating the fact that appellant and his companion were seen near building where burglary had occurred merely gave rise to "suspicion," not probable cause).

There is an additional reason to affirm the Trial Court's ruling on the probable-cause issue. We have said that the question of whether the police have probable cause for an arrest rests upon the collective information of the police officers rather than upon the information known to the individual officer who encounters the defendant. *Tillman v. State,* 271 Ark. 552, 609 S.W.2d 340 (1980). The majority relies upon this principle to explain away the fact that Deputy Box and Officer Plafcan, the officers who approached Mr. Bell on January 8, did not individually have probable cause to arrest Mr. Bell. According to the majority, the police "collectively" possessed knowledge that constituted probable cause to arrest Mr. Bell, and thus Mr. Bell's statement on January 8 was erroneously suppressed.

The majority overlooks, however, our holding in *Friend v. State, supra,* and Ark. R. Crim. P. 4.1(d). According to Ark. R. Crim. P. 4.1(d),

[a] warrantless arrest by an officer not personally possessed of information sufficient to constitute reasonable cause is valid *where the arresting officer is instructed to make the arrest by a police agency which collectively possesses knowledge sufficient to constitute reasonable cause* [emphasis added].

We considered that rule in the *Friend* case and held that an arrest made by an officer who personally lacks probable cause to arrest is invalid unless the arresting officer is specifically instructed to make an *arrest* by officers who possess probable cause to arrest. In the *Friend* case, the testimony showed that the arresting officers lacked probable cause themselves and were instructed only to stop the appellant and hold him for questioning. No one who possessed probable cause to arrest told the officers who detained the appellant to arrest him. As a result, we held the arrest was made in violation of Ark. R. Crim. P. 4.1(d).

The *Friend* case has a clear application to the case at bar. Under our cases interpreting Rule 2.3, we say that a violation of the rule is excused if the police had probable cause to arrest the defendant at the time of the request to accompany the police to the office. The rationale behind this "exception" to the suppression requirement is that, if the police could have *legally* arrested the defendant in any event, then there is no reason to suppress the statement on account of their failure to provide the verbal warning under Rule 2.3. The availability of this "probable-cause exception" thus depends on whether the police could have made a legal arrest of the defendant at the time the "request" under Rule 2.3 was made.

Here, there was no "arrest" of Mr. Bell, and thus it may be tempting to distinguish the *Friend* case on that basis. However, it is clear that Deputy Box and Officer Plafcan, at the time they requested Mr. Bell to accompany them to the station, could not have made a legal arrest. The testimony at the suppression hearing clearly shows that they, like the officers in the *Friend* case, were not instructed to arrest Mr. Bell. Thus, even if the police "collectively" had probable cause to arrest Mr. Bell, any arrest made by these particular officers at that moment on January 8 would have been illegal under our holding in the *Friend* case. Therefore, we cannot say that the statement should have been admitted under the

"probable-cause exception" to the general rule of suppression prescribed by Rule 2.3.

I respectfully dissent.

GLAZE and IMBER, JJ., join in Part Two of this opinion.

ANNABELLE CLINTON IMBER, Justice, dissenting. I join the portion of Justice Newbern's dissent finding that the police lacked probable cause to arrest Bell on January 8. I write separately to dissent from the majority's significant announcement, without explanation and completely in the form of *obiter dictum*, that this court will no longer interpret Ark. R. Crim. P. 2.3 to require police officers to inform individuals that they have no legal obligation to accompany them to the police station. This declaration is entirely unnecessary to a resolution of the present case, given the majority's holding that the officers' failure to give Bell a Rule 2.3 warning on January 8 was irrelevant because they had probable cause to arrest Bell on that date. I fail to understand how this case squarely presents us with an opportunity to reconsider our adherence to the bright-line interpretation of Rule 2.3. *See Martin v. State*, 328 Ark. 420, 944 S.W.2d 512 (1997) (Brown, J., concurring). I would note that the State does not even request that we undertake such a reconsideration of Rule 2.3. Quite the opposite, the State relies on our bright-line interpretation, arguing that the trial court erred in finding that the police violated Rule 2.3 on January 5, emphasizing McCord's testimony that he told Bell he did not have to accompany him.

As early as *Burks v. State*, 293 Ark. 374, 738 S.W.2d 399 (1987), we have read Rule 2.3 to impose a positive duty upon police officers to warn individuals that they are free to leave. *See also Martin v. State, supra; Prowell v. State*, 324 Ark. 335, 921 S.W.2d 585 (1996); *Smith v. State*, 321 Ark. 580, 906 S.W.2d 302 (1995); *Hart v. State*, 312 Ark. 600, 852 S.W.2d 312 (1993); *Addison v. State*, 298 Ark. 1, 765 S.W.2d 566 (1989); *Burnett v. State*, 295 Ark. 401, 749 S.W.2d 308 (1988). I consider it imprudent to abandon such an established line of precedent where the parties have presented absolutely no argument or briefing on the relative

merits of such a course of action. For these reasons, I respectfully dissent.