Darwin SHIELDS *v.* STATE of Arkansas

CR 01-288 70 S.W.3d 392

Supreme Court of Arkansas
Opinion delivered March 21, 2002

*Gregory E. Bryant*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

TOM GLAZE, Justice. Darwin Shields was convicted of the capital murder of Sarah Stafford and sentenced to life in prison. On appeal, he argues that the trial court erred in refusing to suppress his custodial statement, and he also asserts that the trial court erred when it increased his bail bond after the State amended the charges against him from first-degree murder to capital murder.

Shields does not challenge the sufficiency of the evidence, so we recite the facts only briefly. Sarah Stafford was reported missing by her mother on March 15, 2000. As police detectives began investigating the case, they spoke to some of Sarah's friends and relatives, who informed the officers that Sarah was pregnant and believed Darwin Shields to be the father. On March 16, 2000, Detectives Laura Pritchett and Jennifer Elmore, accompanied by uniformed officer Jerry Best, went to speak to Shields at University Mall in Little Rock, where he worked at a store called Champs. Shields accompanied the officers to his car in the parking lot, and Detective Elmore found a pair of grey sweatpants in the car's trunk. Because the sweatpants matched a description of what Sarah had been wearing before she disappeared, the officers decided to take Shields to the downtown police station for further questioning. Detective Elmore called for a patrol car to transport Shields downtown; when the patrol car arrived, Shields was temporarily placed in handcuffs and taken to the police station.

Upon arriving at the station, Detective Eric Knowles removed Shields's handcuffs and advised Shields that he was under no obligation to be there; Shields indicated that he was concerned about Sarah, and he wanted to cooperate. Shields was advised by Knowles that he was a suspect and Knowles then read Shields his *Miranda* rights. After about two and a half hours, Shields gave a statement to Detective Eric Knowles in which he confessed to strangling Sarah. Shields was then placed under arrest, and at that time, he took the police to where Sarah's body was located.

Prior to trial, Shields filed a motion to suppress his statement, arguing that, contrary to Ark. R. Crim. P. 2.3, he had never been informed of the fact that he was under no legal obligation to accompany the officers to the police station. The trial court

denied the motion after a hearing on September 29, 2000. The case proceeded to trial on November 13, 2000, and a jury convicted Shields of capital murder. Because the State waived the death penalty, Shields was sentenced to life in prison.

On appeal, Shields again argues that the trial court erred in denying his motion to suppress his statement. We have repeatedly held that we review a trial court's ruling on a motion to suppress by making an "independent determination based upon the totality of the circumstances, viewing the evidence in a light most favorable to the State." *Barcenas v. State*, 343 Ark. 181, 33 S.W.3d 136 (2000); *Wright v. State*, 335 Ark. 395, 983 S.W.2d 397 (1998). The ruling will only be reversed if it is clearly against the preponderance of the evidence. *Green v. State*, 334 Ark. 484, 978 S.W.2d 300 (1998); *Travis v. State*, 331 Ark. 7, 959 S.W.2d 32 (1998).

As pointed out above, Shields's contention is that the officers who initially contacted him violated Ark. R. Crim. P. 2.3. That rule provides as follows:

> If a law enforcement officer acting pursuant to this rule requests any person to come to or remain at a·police station, prosecuting attorney's office, or other similar place, *he shall take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request.*

(Emphasis added.)

Shields specifically alleges that he was not advised that he was under no obligation to appear at police headquarters for questioning, and that Detectives Elmore and Pritchett should have given him this information in clear and unambiguous terms. In support of this argument, he cites the case of *State v. Bell*, 329 Ark. 422, 948 S.W.2d 557 (1997). However, *Bell* does not help Shields. In fact, in *Bell*, this court announced its intention to no longer interpret Ark. R. Crim. P. 2.3 to require a *verbal warning* of freedom to leave as a "bright-line rule for determining whether a seizure of the person has occurred under the Fourth Amendment and whether a statement to police officers must be suppressed." *Bell*, 329 Ark. at 431. Rather, the court stated, "we will view a verbal admonition of freedom to leave as *one factor to be considered in*

*our analysis of the total circumstances surrounding compliance with Rule 2.3.* In short, when interpreting Rule 2.3 in the future in deciding whether a seizure of a person has transpired, we will follow *United States v. Mendenhall,* 446 U.S. 544 (1980)." *Id.*[1] (Emphasis added.)

In the *Mendenhall* case, the Supreme Court held that the question of whether or not one's consent to accompany police officers is voluntary or is the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances, and is a matter which the government has the burden of proving. *Mendenhall,* 446 U.S. at 557. The court wrote as follows:

> We adhere to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez-Fuerte,* 428 U.S. 543 (1976). As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.
>
> * * * *
>
> We conclude that a person has been *"seized"* within the meaning of the Fourth Amendment *only if,* in view of all of the circumstances surrounding the incident, *a reasonable person would have believed that he was not free to leave. Examples of circumstances*

---

[1] Prior to deciding *Bell,* the court had followed the "bright line" approach and had held that "a statement must be suppressed under Rule 2.3 if the police officers simply fail to notify the person that they do not have to come to the station for questioning." *Martin v. State,* 328 Ark. 420, 944 S.W.2d 512 (1997) (noting that the court has imposed a positive duty upon the police to inform the citizen of his or her right to refuse the request although the plain words of Rule 2.3 do not specifically require such a verbal notice). *Bell* specifically retreated from this interpretation. We further note that, even under the prior interpretation requiring a verbal warning of a person's freedom to leave, Shields's argument would fail because the officers here did inform him he was free to leave.

that might indicate a seizure, even where the person did not attempt to leave, *would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.* [Citations omitted.] In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Id.* at 554–55 (emphasis added).

At the suppression hearing in this case, Detectives Elmore and Pritchett and Officer Best all testified that they repeatedly informed Shields that he was not under arrest. Detective Elmore testified that she told Shields that he was not under arrest and that he did not have to go with the officers. Elmore also noted that she felt that, by saying, "you're not under arrest," Shields would understand that he was not obligated to come with her. Detective Pritchett testified that she heard Elmore tell Shields, "You understand that you don't have to come with us, or you're not under arrest," and that Shields said he understood. Pritchett also stated that, had Shields at any time indicated that he wanted to leave, he would have been free to do so. Officer Best confirmed that Elmore repeatedly told Shields that he was not under arrest, that he was just a witness, and that they only needed to talk to him. Best further said that Shields was free to leave at any time.

In addition, Best noted that, although Shields was placed in handcuffs to be transported to the police department, that action was only taken pursuant to police department policy, which he explained to Shields. Before Shields was placed in the patrol car, Best told him again that he was not under arrest, and that the handcuffs were only for the safety of the officer driving the patrol car and for Shields's own safety. The handcuffs were removed as soon as Shields arrived at the police station.

As already stated above, Detective Knowles, who interviewed Shields once he arrived at police headquarters, testified that he told Shields that it was his understanding that Shields had agreed to come down to the station. Knowles further let Shields know that he was under no legal obligation to be there at that time, and Shields said he understood that; Shields also indicated that he was

willing to cooperate, and he verbally indicated that he had agreed to come down and talk to the police about the case. Also set out above, Knowles read Shields his *Miranda* rights and had him sign the rights form at 1:09 p.m. Knowles let Shields know that the police were possibly investigating — and that Shields was possibly a suspect in — a capital murder, although, at the time, Knowles said he was only aware that it was missing- persons case that potentially had come to involve some type of foul play.[2]

Knowles also testified that, when Shields received his *Miranda* warnings, he was a suspect, not under arrest, and was not arrested until he confessed to killing Sarah. Until that time, according to Knowles, Shields was free to get up and walk out of the interview room. Knowles admitted that he had not told Shields that he did not have an obligation to come to the police station, but asserted that, because Shields was an adult, Knowles assumed that it would be good enough to ask if Shields had agreed to come to the detective's office. When asked that question, Shields said yes. Although Shields himself offered testimony to contradict the police officers' assertions, he conceded on cross-examination that he had agreed to go to the police station willingly.

As noted above, Rule 2.3 does not require an explicit statement that one is not required to accompany the police; rather, the police only need to take such steps as are "reasonable to make clear that there is no legal obligation to comply" with the request to come to the police station. Here, the testimony offered at the suppression hearing supports the conclusion that the officers made it reasonably clear to Shields that he was only wanted for questioning, and that he did not have to go to the police station. Accordingly, the trial court's ruling was not clearly against the evidence, and the court, therefore, did not err in denying Shields's motion to suppress.

---

[2] The reason for advising Shields that he was a potential suspect in a capital murder, according to Knowles, was because it was standard practice to advise an individual that he or she was charged under a "higher degree crime," so that, if the charge actually were to be revised upward, the suspect would have been informed of his rights knowing the highest possible charge he might be facing.

■ Shields raises an alternative argument that the court erred, contending that he was arrested without probable cause. In support of this assertion, he points to the fact that he was handcuffed while he was being transported to the police station, and argues that Officer Best informed Officer Zebbie Burnett, who transported Shields to the police station, that Best considered Shields to be a possible suspect in a homicide or abduction. With respect to this latter issue, however, we have held that the subjective beliefs and opinions of other persons, including law enforcement officers, regarding whether a person is free to leave are irrelevant. *See Arnett v. State*, 342 Ark. 66, 27 S.W.3d 721 (2000); *see also Ohio v. Robinette*, 519 U.S. 33 (1996) (holding that subjective intentions play no role in ordinary, probably cause Fourth Amendment analysis).

As to the matter of Shields's being placed in handcuffs for transport to the police station, we observe first that Best informed Shields that such action was police department policy. Best testified at the suppression hearing that he told Shields, "You understand that you're not under arrest. This is just for the safety of yourself and for the officers. We have a policy that kind of covers this, and this is the officer's choice basically, but you understand that you are not under arrest for anything?" · Shields responded that he understood, and in so doing, his acknowledgment of the fact belies any argument that the officers had placed him under arrest.

■ However, our decision need not turn on the question of the police department's internal policy regarding handcuffing suspects for transport to the police station. Even assuming that Shields was illegally arrested, the Supreme Court in *Brown v. Illinois*, 422 U.S. 590 (1975), stated that it is entirely possible that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality. However, the question of whether a confession was the product of a free will is to be answered *under the facts of each case*, although no single fact is dispositive. While there is no *per se* rule that the giving of *Miranda* warnings alone can break the causal connection between an illegal

arrest and a subsequent confession,[3] the *Brown* Court held that a number of factors must be considered in determining whether a confession is obtained by exploitation of an illegal arrest. In addition to the giving of *Miranda* warnings, a court should also consider "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct[.] *The voluntariness of the statement is a threshold requirement." Brown*, 422 U.S. at 603-04 (emphasis added).

In the present case, Shields himself acknowledged that he went to the police station freely. As noted above, Shields was handcuffed by Officer Zebbie Burnett and placed into the patrol car sometime between 12:30 and 1:00 p.m. Shields asked Burnett if he was under arrest, and Burnett said, "Well, yeah, I guess. I don't know." Shields further testified that, when he asked Burnett what he was "under arrest" for, Burnett replied, "I don't know what's going on. I'm just taking you downtown." Shields was then taken to the police station, where Burnett removed his handcuffs, and Detective Knowles informed Shields that he was under no legal obligation to be at the station. Shields told Knowles that he was concerned about Sarah and wanted to cooperate. He was read his *Miranda* rights at 1:09 p.m., according to Detective Knowles. Knowles began to interview Shields at that time, and began taping his statement at 3:28 p.m., after Shields stated that he had, in fact, killed Sarah. At the beginning of the taped statement, Knowles called Shields's attention to the *Miranda* form, and had Shields again acknowledge that he had read and understood each of the rights on the form. The interview concluded at approximately 4:05 p.m.

Viewing the evidence in the light most favorable to the State, the record reveals that Shields did not appear to have been coerced into giving his statement. Knowles, as well as the other officers involved in questioning Shields, testified that Shields was

---

[3] The Court said that if *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. *Brown*, 422 U.S. at 602.

polite and cooperative at all times, and he agreed that he was at the police station of his own free will. Given the totality of the circumstances, we cannot agree that — even if Shields had been illegally arrested — his confession was anything other than voluntary.

 Shields raises one further argument on appeal, namely, that the trial court erred when it increased his bond from $50,000 to $500,000 after the State increased the charges against him from first-degree murder to capital murder. However, because we affirm his conviction, the question of his pretrial bond is moot. This court does not decide moot issues. *See K.S. v. State*, 343 Ark. 59, 31 S.W.3d 849 (2000) (a case is moot when any decision rendered by this court will have no practical legal effect on an existing legal controversy).

Affirmed.

CORBIN, J. not participating.