Christina Marie RIGGS *v.* STATE of Arkansas

CR 98-1281                                              3 S.W.3d 305

Supreme Court of Arkansas
Opinion delivered November 4, 1999

*John Wesley Hall, Jr.*, for appellant.

*Mark Pryor*, Att'y Gen., by: *David R. Raupp*, Sr. Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Christina Marie Riggs appeals her judgment of conviction for the capital murder of her two children, Justin Thomas (age 5) and Shelby Riggs (age 2). She raises four points on appeal relating to the guilt phase of her trial: (1) that her statement to police was involuntary and her waiver of *Miranda* rights was also involuntary, unknowing, and unintelligently made due to her attempted suicide by drug overdose and overreaching police conduct; (2) that the trial court erred in refusing to give instructions that the jury should consider her mental disease and defect in assessing her ability to form the necessary intent to murder; (3) that the trial court erred in overruling her objection to prejudicial remarks in the prosecutor's opening statement; and (4) the trial court erred in admitting into evidence four prejudicial photographs. Riggs presents no issues relating to the sentencing phase of her trial and at her trial asked to receive the death penalty after her guilt for capital murder was determined. We are not persuaded that any of these issues has merit, and we affirm.

The record reveals that at the time of the murders of her children Riggs was a licensed practical nurse at the Arkansas Heart Hospital in Little Rock. On the last day of her work at the hospital which was November 4, 1997, she obtained Elavil, which is an antidepressant. She also obtained morphine and potassium chloride. She returned to her residence in Sherwood, and that night at about ten o'clock, she gave Elavil to her children to make them sleep. After they fell asleep, she injected Justin with potassium chloride. When he woke up crying in pain, she injected him with morphine. When that did not quiet him, she smothered him with a pillow. According to Riggs, Justin fought back as she smothered him. After her experience with Justin and the potassium chloride, she decided to smother Shelby with a pillow, which she did. She told police that Shelby only fought "a little bit." Following the murders, she moved the bodies of the dead children into her bedroom and placed them together in her bed. She wrote suicide notes

to her mother, Carol Thomas; her sister, Roseanna Pickett; and a former husband, John Riggs. She next took a considerable dosage of Elavil and injected herself with potassium chloride. The drugs caused her to pass out on her bedroom floor. This was estimated to have occurred at approximately ten-thirty p.m. that same night.

The following day, which was November 5, 1997, Riggs's mother attempted to locate her and came to her house in Sherwood at about four o'clock in the afternoon. She found the bodies of the two children and her unconscious daughter. She called 911, and paramedics arrived on the scene. The paramedics eventually took Riggs to Baptist Memorial Hospital in North Little Rock at about five-thirty p.m., where her stomach was pumped and she was stabilized.

Meanwhile, the Sherwood police conducted a search of Riggs's home, where they found the suicide notes, the bottle of Elavil, the morphine, potassium chloride, and the used syringes. Back at the hospital, Riggs's family members had arrived, including her mother and sisters, and they asked to see her. The Sherwood Police Department had instructed police officers and hospital staff not to permit her to talk to or see her family. Shortly after midnight, Riggs's family retained an attorney to represent her. The attorney contacted the Sherwood Police Department and told police officers not to speak to Riggs without his being present.

On the morning of November 6, 1997, Detectives Charles Jones and Cheryl Williams of the Sherwood Police Department arrived to take Riggs's statement. At 9:20 a.m., Detective Jones gave Riggs *Miranda* warnings and took an eight-minute statement. In that statement, Riggs admitted to killing her children and explained the details of the killings, together with her attempted suicide. Riggs was released from the hospital several hours later and moved to the Pulaski County Jail. She was charged with two counts of capital murder. Later, she pled not guilty by reason of mental disease or defect.

Before her trial, Riggs moved to suppress the statement made to the Sherwood detectives in the hospital on the basis that her statement was involuntary because of her drugged condition and because her family had retained an attorney for her. According to her motion, taking the statement under these conditions violated

her right to due process of law and her right to counsel. The trial court denied Riggs's motion and found that after listening to a recording of her statement, there was no indication that she was hallucinating. The court also found that she was sufficiently coherent, that her statement was voluntary, and that she had been accorded her rights under *Miranda*.

At trial, the jury rejected Riggs's defense of mental incapacity caused by severe depression, and she was convicted on both counts of capital murder. During the penalty phase, Riggs testified and asked that she be sentenced to death. The jury sentenced her to death on both counts. Riggs initially refused to appeal, and this court stayed her execution for a determination of whether she had the capacity to choose between life and death under *Franz v. State*, 296 Ark. 181, 754 S.W.2d 839 (1988). *See Riggs v. Humphrey*, 334 Ark. 231, 972 S.W.2d 946 (1998) (*per curiam*). Before the trial court could conduct the hearing, Riggs agreed to appeal the guilt phase of her trial. She instructed her attorney not to appeal any of the issues related to the penalty phase.

## I. Suppression of Her Statement

For her first point, Riggs claims that the trial court erred in finding that her statement to the detectives was voluntary and her waiver intelligently made, because she was still under the influence of the drugs taken during her suicide attempt and was hallucinating when she made her statement. She further claims that isolating her from family and retained counsel violated her Fifth and Sixth Amendment rights.

### a. Custody

We initially address whether Riggs was an accused in custody at the time she gave her statement to the Sherwood police. The State argues that she was not in custody for purposes of *Miranda* protection when she talked to the police detectives. We disagree.

In 1995, we discussed several United States Supreme Court decisions regarding what constitutes custodial interrogation:

It is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a "degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984), citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam). Stated another way, the Supreme Court defined custodial interrogation as meaning the questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of action in any significant way. *Miranda v. Arizona*, 384 U.S. 436, 444 (1965); *see also Stansbury v. California*, 114 S.Ct. 1526 (U.S. 1994) (per curiam); and *Oregon v. Mathiason*, 429 U.S. 492 (1977) (per curiam). The Supreme Court further explicitly recognized that *Miranda* warnings are not required simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Beheler*, 463 U.S. at 1125. In resolving the question of whether a suspect was "in custody" at a particular time, the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation. The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being interrogated. *Stansbury*, 114 S.Ct. at 1529.

*State v. Spencer*, 319 Ark. 454, 457, 892 S.W.2d 484, 485 (1995). In later cases, we have followed the standards set forth in *Spencer*. *See, e.g., Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997); *Soloman v. State*, 323 Ark. 178, 913 S.W.2d 288 (1996).

■ In the instant case, we have no doubt that viewing the objective circumstances, a reasonable person in Riggs's shoes would have believed she was in custody. First, she was under a police guard at the hospital, she was strapped to her bed in the ICU unit, and her family was prevented from seeing her.[1] Second, the police officers had found her dead children and had reasonable cause to believe that she killed them based on the suicide notes found at her house. Third, she was read her *Miranda* rights by the Sherwood police detectives, which indicates that she was more than a mere suspect. We hold that the objective circumstances of the interrogation support a conclusion that Riggs was in custody.

---

[1] There was some testimony that Riggs may not have been "in restraints" at the time of her statement, but the State conceded she was at oral argument. Restraints were imposed because she was combative when first admitted to the hospital.

### b. Voluntariness of the Statement.

We have said that statements made while in police custody are presumed to be involuntary and the burden rests on the State to prove their voluntariness and a waiver of *Miranda* rights by a preponderance of the evidence. *See Rychtarik v. State*, 334 Ark. 492, 976 S.W.2d 374 (1998); *Smith v. State*, 334 Ark. 190, 974 S.W.2d 427 (1998). In determining voluntariness, this court looks to whether the statement and waiver were the result of free and deliberate choice rather than coercion, intimidation, and deception. *Rankin v. State*, 338 Ark. 723, 1 S.W.3d 14 (1999); *Smith v. State, supra, citing Colorado v. Spring*, 479 U.S. 564 (1987) and *Moran v. Burbine*, 475 U.S. 412 (1986). On appeal, this court makes an independent determination of the voluntariness of a confession, but in doing so, we review the totality of the circumstances and will reverse only when the trial court's finding of voluntariness is clearly against the preponderance of the evidence. *See Jones v. State*, 323 Ark. 655, 916 S.W.2d 736 (1996); *Trull v. State*, 322 Ark. 157, 908 S.W.2d 83 (1995). We recognize in our determination of whether a trial court's finding is clearly erroneous that conflicts in testimony are for the trial court to resolve. *See Jones v. State, supra*. Where it is apparent from the record that a statement is not the product of an accused's free and rational choice and where the undisputed evidence makes clear that the accused did not want to talk to police detectives, the Supreme Court has held that due process of law requires that the resulting statement not be used against the accused. *Mincey v. Arizona*, 437 U.S. 385 (1978). Other factors mentioned in *Mincey*, in addition to the fact that the accused made repeated requests that the interrogation stop so he could retain a lawyer, were that he was weakened by pain and shock, isolated from family, friends, and legal counsel, and was barely conscious. Under these circumstances the Court held that Mincey's will was overborne and the statement could not be used against him.

Riggs argues lack of voluntariness in connection with her statement but also as concerned her waiver of *Miranda* rights. Her primary claim is that her medical condition rendered her vulnerable and that she was hallucinating and delusional at the time of the statement. She was, according to her theory of the case, incapable of choosing to make a voluntary statement when she talked to the Sherwood detectives the morning of November 6, 1997.

We turn then to the statement made by Riggs to the police detectives, the accuracy of which was stipulated by the prosecutor and defense counsel:

DETECTIVE JONES: This is Detective Jones of the Sherwood Police Department. Today's date is November 6, 1997. The time is 9:20 a.m. Present in this inter.. room is Detective Cheryl Williams and Christina Riggs. Christina, do you understand that I am tape recording this?

RIGGS: Yes, I do.

DETECTIVE JONES: Okay, Christina. I want to advise you of your rights. You have the right to remain silent. Anything you say, can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. (*Riggs crying*) If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. (*Riggs crying*) You can decide at any time to exercise these rights and not answer any questions (*Riggs crying*) or make any statements. Do you understand your Miranda rights, Christina? (*Riggs crying in the background*)

RIGGS: Yes, I do, sorry.

DETECTIVE JONES: You do. Okay. Christina, what we are doing is investigating the death of your two babies. Do you want to tell us what happened?

RIGGS: (*Crying*) I killed them.

DETECTIVE JONES: What did you say?

RIGGS: I said...

DETECTIVE JONES: Did you say you killed them?

RIGGS: I'm sorry.

DECTECTIVE JONES: Christina, how did you go about doing that?

RIGGS: I got some bottles (*inaudible*) and stuff from here...I need a cigarette (*inaudible*)...Darvocet.

DETECTIVE JONES: Are you saying that you got some medicine from the hospital?

RIGGS: (*no verbal response*)

DETECTIVE JONES: Christina, how did you do it? Did you give them an injection? Did you give them a shot?

RIGGS: I tried to ... and ... I did it with Justin, because I figured with him being the oldest one that he would give me more problem.

DETECTIVE JONES: Uh-huh. (*yes*)

RIGGS: So, I tried it with him and I thought it would just stop his heart. But it hurt. Oh, he said it hurt...(*inaudible*).

DETECTIVE JONES: Uh-huh. (*yes*)

RIGGS: It didn't work, he just kept calling, "Momma! Momma! Momma!" I just figured it was too late now because I had no place to turn back to. I cleaned out my checking account and gave my mother all the money I had. (*Crying*)

DETECTIVE JONES: Christina, why did you do this?

RIGGS: Because I wanted to die. But I didn't want to die and leave my kids behind or for them to be a burden to somebody else. I didn't want them to think I didn't love them and I didn't want them to grow up separately because they have two different Daddy's. And I knew if I passed away they would be fighting my Mother for custody and I didn't want that for nobody.

DETECTIVE JONES: You felt like you were doing it for the kids' sake?

RIGGS: In a way, yeah. (*Inaudible*)...my piece of mind.

DETECTIVE JONES: Christina, did you really want to die?

RIGGS: (*Crying*)

DETECTIVE JONES: And you felt it would be better if your children just die with you and ... was the children already dead before you took your medicine?

RIGGS: Yes.

DETECTIVE JONES: How long had they been dead before you took your medicine?

RIGGS: About twenty minutes.

DETECTIVE JONES: About twenty minutes?

RIGGS: That's because I drank and got up and smoked a cigarette and got back and sit for a minute and (*inaudible*) I was like, "Okay, I'm going to do it now. I can't turn back now because you've already killed Justin." And ... so I did it.

DETECTIVE JONES: What time did you give them the medicine? Do you remember?

RIGGS: (*inaudible*) Justin about 10:15 or 10:30.

DETECTIVE JONES: 10:15 or 10:30 in the morning?

RIGGS: No, in the evening.

DETECTIVE JONES: Oh, in the evening?

RIGGS: Last night.

DETECTIVE JONES: Okay.

RIGGS: Then I smoked another cigarette and waited ... and suffocated Shelby.

DETECTIVE JONES: You suffocated Shelby?

RIGGS: (*Crying*)

DETECTIVE JONES: What did ... how did you suffocate her?

RIGGS: I put a pillow over her head.

DETECTIVE JONES: Okay, Did you...

RIGGS: (*Crying*)

DETECTIVE JONES: Had you given her any medicine at all, or...any of the Morphine or the Potassium Chloride?

RIGGS: I slipped them ... I made them drink half of an Elavil because I figured that would make them sleep a little bit better so that it wouldn't wake them (*inaudible*).

DETECTIVE JONES: So, Shelby, Shelley, you killed her with a pillow. You suffocated her. And what about the little boy. How did you do him?

RIGGS: I gave him the medicine and when it didn't work (*inaudible*).

DETECTIVE JONES: You suffocated him too?

RIGGS: (*Crying*) yes.

DETECTIVE JONES: With a pillow?

RIGGS: (*Crying*)

DETECTIVE JONES: Were they fighting while you were suffocated (*sic*) them?

RIGGS: Justin did. Shelby a little bit but not much. (*Crying*)

DETECTIVE JONES: When did you decide to do this, Christina? On what day did you decide to do this?

RIGGS: Uh ... the best I remember it was Sunday night or Saturday night, because we was out talking and this and that and the other ... and they caught me.

DETECTIVE JONES: Who caught you?

RIGGS: The Sherwood (*inaudible*) got me depressed. I was thinking about what was going on in my life and that things aren't always working for me and (*inaudible*).

DETECTIVE JONES: When did you get those drugs from the hospital?

RIGGS: When?

DETECTIVE JONES: Uh-huh? (*Yes*)

RIGGS: Yesterday.

DETECTIVE JONES: Yesterday?

RIGGS: (*No verbal response*)

DETECTIVE JONES: You mean the day that you killed them? Is that the day that you got the drugs? The last was it...

RIGGS: (*Inaudible*) Seventh street right (*inaudible*).

DETECTIVE JONES: Was it the last day that you worked at the hospital or the day before that?

RIGGS: I think...

DETECTIVE JONES: When you got...

RIGGS: I got the drugs and I gave them to my kids. That's the only drugs that I had in my hand. And I know that there was three Valiums in a vial in there, but there wasn't enough to even cover the jar up (*inaudible*) put it in my pocket and bring them home.

DETECTIVE JONES: Uh-huh. (*yes*)

RIGGS: And I know I should have thought better ... had somebody rinsing with me, but ... they were just what came home in my pockets.

DETECTIVE JONES: Did you know what you were going to do when you took the drugs from the hospital? Did you have intentions of giving them to your children? And how many days did you think about this before you killed your children?

RIGGS: About three weeks. Two weeks.

DETECTIVE JONES: Two or three weeks. In other words, you've been thinking about doing this for the last two or three weeks?

RIGGS: (*No verbal response*)

DETECTIVE JONES: What made you decide to just go ahead and do it?

RIGGS: I just can't take it no more.

DETECTIVE JONES: You couldn't take it any more.

RIGGS: I felt like I was out of control.

DETECTIVE JONES: Did you just feel like your life was in a mess?

RIGGS: (*No verbal response*)

DETECTIVE JONES: Had you talked to anybody about this? Your Mom or anybody?

RIGGS: I've tried to talk to people about what I feel and what I think and they were just like, "I don't have time right now. We'll do it some other time." So, I just got to where I don't care any more. I (*inaudible*) but they can't give me no help.

DETECTIVE JONES: So you just felt like nobody was listening to you?

RIGGS: (*Crying*)

DETECTIVE JONES: Okay, Christina...

RIGGS: Answer me something. Did you come down the escalators by yourself?

DETECTIVE JONES: Uh, did we come down the escalator by ourself?

RIGGS: Your Mother. When ... she came in town.

DETECTIVE JONES: Your Mother?

RIGGS: It seems like I keep seeing some old people getting on the elevators ... sitting down away from the (*inaudible*). She didn't like what was on it, so she put (*inaudible*) just like your mother.

DETECTIVE JONES: Christina, do you have anything more to say about your babies or anything?

RIGGS: I wish I hadn't done it now.

DETECTIVE JONES: Okay. Detective Williams, do you have anything to add to this interview?

DETECTIVE WILLIAMS: No.

DETECTIVE JONES: This is Detective Jones, the time is 9:28 a.m. This concludes this interview.

The trial court had the recorded statement and transcribed text before it at the suppression hearing. The court also had the testimony of Dr. Joe Buford, who was the emergency room physician late afternoon on November 5, 1997, when Riggs was admitted to Baptist Memorial Hospital. He testified that she was presented as a "probable overdose," and because of this, her stomach was pumped, and she was given charcoal to absorb any of the remaining drugs in her stomach. Dr. Buford testified that he saw Riggs on the morning of November 6, 1997, and at that time, she was alert and oriented and her vital signs were stable. This was before Riggs gave her statement. He added that she responded appropriately to his questions, and that she did not appear to be incoherent or suffering from hallucinations at that time.

Karen Stiles, a registered nurse in the intensive care unit at the hospital, testified that she first came into contact with Riggs on the evening of November 5, 1997. Ms. Stiles stated that at that time, Riggs was combative and incoherent. Ms. Stiles testified that the

next morning, Riggs was calm, and she answered questions appropriately. Ms. Stiles referred to her assessment notes and stated that at seven-thirty or eight o'clock in the morning, Riggs was awake, alert, and oriented. She also testified that according to her notes, Riggs was speaking rapidly and was hard to understand, but that she could understand her. Ms. Stiles then referred to the assessment she did of Riggs using the Glascow Coma Scale. According to Ms. Stiles, the scale is used to determine a patient's level of consciousness. Ms. Stiles testified that at eight o'clock in the morning on November 6, 1997, she gave Riggs a fifteen, the highest score she could receive on the scale. On cross-examination, Ms. Stiles noted that Riggs signed the discharge orders from the physician but that her signature was illegible.

Detective Jones and Detective Williams testified at the suppression hearing that Riggs made no attempt to stop the statement and that they in no way forced her to give the statement. Detective James Harper of the Sherwood Police Department testified that he sat in Riggs's hospital room the night of November 5, 1997, and the early morning of November 6, 1997. At one point he overheard her say: "I had to do it so I wouldn't leave them behind."

To counter this evidence, Riggs called several witnesses at the suppression hearing. Another emergency room physician, Dr. Jim Rice, testified that Riggs was "combative at times" and "just incoherent and not really making any sense," when she was brought into the emergency room on November 5, 1997. Julia Brown, a nurse, stated that Riggs was confused as late as four o'clock in the morning of November 6, 1997, but she was not surprised that the nurse on the next shift four hours later found her to be alert, oriented, and responsive because it is not unusual for an overdose victim "to come around."

Riggs's family members also testified at the suppression hearing. Her mother, Carol Thomas, told the court that Riggs was confused the day after the statement was given about whether Shelby was alive. She "hallucinated" about a conversation with her that did not happen. Riggs's sister, Roseanna Pickett, testified that the day after the statement, Riggs was incoherent and thought she was playing with Shelby. Her aunt, Mary Willis, testified that the next day, Riggs was "seeing things," including her dead children and a piece of gum. Another sister, Elizabeth Nottingham, testified

that the following day, Riggs was groggy, not making sense, and "describing hallucinations." There is, too, the fact that at the end of her questioning Riggs made reference to the detective's mother descending on an escalator and old people getting on elevators which had no bearing on the subject matter of the interview and was arcane and bizarre.[2]

The trial court was confronted with all of this testimony and the statement itself and found the statement to be voluntary and not the product of delusion or hallucinations. It is clear to us that the testimony was in conflict, and we have no doubt that Riggs was somewhat impaired at the time she talked to police detectives because of the drug overdose. Yet, we have resolutely held that conflicts in the testimony and the extent of her impairment are for the trial court to resolve. *See, e.g., Jones v. State, supra; Trull v. State, supra.* We also defer to the trial court in its determination of credibility of witnesses in suppression matters. *See Rankin v. State, supra.* In the instant case, according to the testimony of Dr. Buford and Ms. Stiles, who were in contact with Riggs the morning of November 6, 1997, Riggs was alert and responsive before she gave her statement. The statement itself further portrays an ability to answer questions and describe events which physical evidence already in the hands of police confirmed. Rational response to questioning is a legitimate factor for the trial court to consider. *See Midgett v. State,* 316 Ark. 553, 873 S.W.2d 165 (1994); *McDougald v. State,* 295 Ark. 276, 748 S.W.2d 340 (1988). And unlike the facts in *Mincey v. Arizona, supra,* Riggs never requested that the interview stop so that she could retain counsel. Under these circumstances, we hold that the trial court did not clearly err in finding that her statement was voluntarily given. *See Jones v. State, supra.*

Having held as we do, there is one aspect of the trial court's ruling following the suppression hearing with which we disagree. The trial court refers to the mental evaluation of Riggs by Dr. John Anderson, a psychologist with the Arkansas Division of Mental

---

[2] In his brief on appeal and during oral argument, counsel for Riggs argued that the testimony of a psychiatrist, Dr. Robert L. Rice, who saw Riggs at 9:30 a.m. on November 6, 1997, showed that at that time she had a "cloudiness of sensorium" and was "a little bit cloudy" and like "someone waking up from anesthesia." Dr. Robert Rice did not testify at the suppression hearing but only at trial. Thus, his testimony was not before the trial court for suppression purposes. Even had it been, we do not view it to be of sufficient impact to render the trial court's finding on voluntariness clearly erroneous.

Health Sciences, who concluded that Riggs was able to appreciate the criminality of her conduct at the time of the murders on November 4, 1997. The trial court stated that it "leaned on" the evaluation in finding Riggs mentally competent to give her statement because the murders and police interview were close in time. That part of the ruling discounts the drug overdose and vulnerability of Riggs to having her will overborne, all of which forms the cornerstone of her voluntariness argument.

The trial court went forward, however, and made the following ruling:

> Furthermore, the Court, in listening to the tape today, doesn't have any indication that there is hallucination during the time of questioning. If so, it's certainly not evident from the tape. And I believe that the statement made by the defendant is sufficiently coherent as to establish the fact that it is a voluntary statement. Her rights were accorded. There's no indication that there are any constitutional violations. There is no indication of any false promises made by police officers. No denial. The statement was given only after the Miranda rights were given.

> And, looking at all the totality of the circumstances, the Court is of the opinion that this statement should not be suppressed. So, the defendant's motion to that effect is denied.

It is this finding by the trial court which we hold is not clearly erroneous.

### c. Legal Counsel

Riggs next contends that her hospital statement was involuntary because police officers isolated her from her family and withheld information that her family had retained legal counsel for her. Counsel had been retained before she gave her statement to the two detectives the morning of November 6, 1997.

There was no reversible error in this regard. The United States Supreme Court has made it clear that failure by police officers to inform an accused that counsel has been retained by the accused's family is not enough to invalidate the confession. *See Moran v. Burbine, supra.* In *Moran,* the accused's sister arranged legal counsel for her brother. The lawyer called the police department

and stated that she would act as the accused's counsel, should the police choose to question him. The lawyer was informed that the accused would not be questioned until the next day. Despite that information, less than an hour later, police officers began a series of interviews where the accused confessed to committing the murder in question. The Court held that the police officers' failure to inform the accused of the attorney's telephone call did not deprive him of information essential to his ability to knowingly waive his Fifth Amendment rights to remain silent or Sixth Amendment right to counsel. The Court said:

> Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right.... No doubt the additional information would have been useful to respondent; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.

475 U.S. at 422. The Court continued: "Nor do we believe that the level of the police's culpability in failing to inform respondent of the telephone call has any bearing on the validity of the waivers." 475 U.S. at 423.

Hence, under *Moran*, even if the Sherwood Police Department deliberately withheld information from Riggs regarding retention of an attorney, that would not invalidate her waiver of her Fifth or Sixth Amendment rights. Those rights are personal to the accused, and she clearly waived them.

### d. Harmless Error.

There is an alternative basis for our affirmance of the trial court's admission of the statement and that is harmless error beyond a reasonable doubt. Here, we are concerned only with the verdict of guilty for capital murder, because Riggs did not contest her death sentence and, indeed, invited it.

To conclude that a constitutional error is harmless and does not mandate reversal, this court must conclude beyond a reasonable doubt that the error did not contribute to the verdict.

*See Jones v. State*, 336 Ark. 191, 984 S.W.2d 432 (1999), *Schalski v. State*, 322 Ark. 63, 907 S.W.2d 693 (1995); *Allen v. State*, 310 Ark. 384, 838 S.W.2d 346 (1992); *Vann v. State*, 309 Ark. 303, 831 S.W.2d 126 (1992); *see also Chapman v. California*, 386 U.S. 18 (1967). The United States Supreme Court has held that the admission of an "involuntary confession" is subject to a harmless error analysis. *See Arizona v. Fulminante*, 499 U.S. 279 (1991); *see also Criddle v. State*, 338 Ark. 744, 1 S.W.3d 436 (1999); *Martin v. State*, 328 Ark. 420, 944 S.W.2d 512 (1997); *rev'd on other grounds, State v. Bell*, 329 Ark. 422, 948 S.W.2d 557 (1997); *Isbell v. State*, 326 Ark. 17, 931 S.W.2d 74 (1996).

In the case before us, the jury heard abundant evidence that Riggs committed the murders. The question then for this court to determine is if we excise from the evidence Riggs's statement given to the Sherwood police detectives, does the remaining evidence show beyond a reasonable doubt that she committed the murders? *See Chapman v. California, supra.* We conclude that it does.

The testimony from Riggs's suicide letters and witnesses for both the State and defense is rife with statements that Riggs admitted she killed her children. What follows are examples of this cumulative testimony:

- Riggs's letter to Carol Thomas saying she had killed the children.

- Riggs's letter to John Riggs saying she had taken the lives of the children.

- Riggs's statement overheard by nurse Julia Brown: "I killed my kids."

- Riggs's telephone call to David McCombs where she described injecting her boy who then cried and smothering her daughter with a pillow.

- Testimony of defense witness, Dr. Bradley Diner, a psychiatrist, that Riggs described how she injected her son with potassium chloride and morphine and suffocated her daughter.

- Testimony of defense witness, Dr. James Moneypenney, a psychologist, that Riggs told him that she killed her children

by giving them Elavil and then smothering them with a pillow. He further testified about Riggs planning the murders forty-eight hours before hand and getting the drugs, pulling money out of her checking account for her mother, and writing suicide letters.

- Testimony of Riggs's sister, Elizabeth Nottingham, that Riggs told her she was sorry for what she did.

- Testimony of Carol Thomas that Riggs told her she injected Justin who cried, "It hurts. It hurts." She couldn't do that to Shelby, she said, so she smothered her.

- State witness Dr. John Anderson, a psychologist, who stated that Riggs told him she killed her children and told him how she did it.

- State witness Dr. Wendall Hall, a psychiatrist, who testified Riggs told him she killed her children immediately before trying to kill herself and that she had planned all this in advance.

There was, in addition, the physical evidence found by police officers at Riggs's residence in Sherwood on November 5, 1997, which included the bottle of Elavil, morphine, potassium chloride, the used syringes, the two deceased children, and Riggs collapsed at the foot of the bed in an unconscious state. There was also the testimony of the medical examiner that there was evidence that the two children had been suffocated.

We conclude that this cumulative evidence of Riggs's confessed guilt and physical evidence established her guilt for capital murder beyond a reasonable doubt even without her statement to the Sherwood police detectives.

## II. Jury Instructions on Intent

For her second point, Riggs contends that the jury instruction given on the affirmative defense of mental disease or defect was misleading because it instructs the jury not to consider the evidence of her mental defect or disease until after it determines that the State has met its burden of proving criminal intent beyond a reasonable doubt. She urges that evidence of mental disease or

defect should be considered by the jury at the time it considers criminal intent as an element of the crime of murder. She concedes that this court has already decided this issue unfavorably to her in *Westbrook v. State*, 274 Ark. 309, 624 S.W.2d 433 (1981), and in *Robinson v. State*, 269 Ark. 90, 598 S.W.2d 421 (1980). She argues, nonetheless, that this court should overrule those decisions. She points to approximately eleven other jurisdictions that require juries to be instructed that evidence of mental disease or defect may be considered by the jury at the time of determining the requisite intent to commit the murder and argues that Arkansas should join those jurisdictions. Her final claim is that with the correct instruction, the jury could very well have convicted her of first- or second-degree murder or even manslaughter, because there was abundant evidence of her depression which drove her to do what she did.

We decline to overrule our existing precedent on this point. First, Riggs has offered no persuasive authority for why our precedent should be overturned. *See McGhee v. State*, 334 Ark. 543, 975 S.W.2d 834 (1998); *Sanders v. County of Sebastian*, 324 Ark. 433, 922 S.W.2d 334 (1996). Second, we do not agree that the instructions given were violative of due process. The instructions read by the trial court include instructions on the law relating to capital murder, first-degree murder, second-degree murder, and manslaughter. Each instruction included the level of criminal intent necessary to commit those crimes. The instructions also advised that the State must prove the elements of the crimes beyond a reasonable doubt. The jury was then instructed that Riggs was not responsible for her crime if, as a result of mental disease or defect, she lacked the capacity to appreciate the criminality of her conduct or to conform it to the requirements of law. To be successful, Riggs must prove this affirmative defense by a preponderance of the evidence. But the trial court reiterated at this point of its instructions that it was the State that had the burden of proving criminal intent for the offense beyond a reasonable doubt.

Riggs would have preferred that the trial court give her two non-AMCI proffered instructions which read:

> Evidence that the defendant suffered from a mental disease or defect may be considered by you along with all the other facts and circumstances of the case in determining whether the defendant

had the required mental state or intent for the crime charged or a lesser offense.

Evidence that the defendant suffered from a mental disease or defect is admissible to prove whether he had the kind of culpable mental state required for commission of the offense charged.

But, again, giving these instructions would have simply run counter to our existing caselaw.

■ We conclude that the instructions which, first, advised the jury that the State had the burden of proving every element of the criminal offense (including all elements of the lesser included offenses) beyond a reasonable doubt and, second, stated that she could prove her defense that she suffered from mental disease or defect by a preponderance of the evidence did not prejudice Riggs or deprive her of due process of law. We affirm the trial court's ruling in this regard.

### III. Prejudicial Opening Statement.

Riggs next argues that the following statement by the prosecutor as part of her opening statement to the jury was prejudicial and unsupported by the evidence:

Ladies and gentlemen, I want you to go somewhere with me. I want you to go with me to the residence at 8015 Bronco Lane, Sherwood, Arkansas. As we walk up the sidewalk to the residence, we go to the front door. And, as we enter the front door, we hear the laughter of two small children. We open the door and they're not there in the front room, so we follow the laughter down a hallway.

MR. HALL: Your Honor, this is argument. Talking about the laughter of two dead children.

THE COURT: This is opening statements. Overrule the objection.

Riggs submits that this dramatic statement had only one purpose — to prejudice the jury against her. She also maintains that the statement had no basis in fact and no evidence was ever presented to support it. Because the prosecutor injected raw emo-

tion into the trial, the trial court abused its discretion in overruling Riggs's objection and allowing this kind of argument.

While theatrical, we do not consider the prosecutor's opening statement of such moment as to warrant a new trial. We decline to reverse the trial court's exercise of discretion on this point. *See, e.g., Rank v. State,* 318 Ark. 109, 883 S.W.2d 843 (1994); *Dixon v. State,* 310 Ark. 460, 839 S.W.2d 173 (1992).

## *IV. Photographs of the Victims.*

For her last point, Riggs points to four photographs and argues that their admission into evidence was inflammatory and prejudicial. She first notes that she admitted from the beginning that she was responsible for the deaths of her children and how she did it.[3] Thus, according to Riggs, the question for the jury to decide was simply whether her severely depressed condition was sufficient to establish either the affirmative defense of not guilty by reason of mental disease or defect or some reduced degree of homicide.

Riggs first objects to Photographs 7 and 10 (Photograph 7 showed the two dead children on Riggs's bed and Photograph 10 showed a needle mark on Justin's neck) as redundant and inflammatory and emphasizes that the trial court did not balance the prejudice against the relevance of these pictures. She further argues that it was error to admit two autopsy photos of the children (Photographs 32 and 34), because cause of death was not an issue in the case. She adds that the trial court did not apply the balancing test to these photos either and never made a finding that their probative value exceeded any prejudice. Riggs concludes with a general argument that because emotions were so high in this case, the photographs only served to inflame the jury and unfairly prejudice her case.

The admission of photographs is a matter left to the sound discretion of the trial court. *See, e.g., Greene v State,* 335 Ark. 1, 977 S.W.2d 192 (1998). When photographs are helpful to explain testimony, they are ordinarily admissible. *See, e.g., Williams v. State,* 322 Ark. 38, 907 S.W.2d 120 (1995). Absent an abuse of

---

[3] This admission in her brief lends weight to a conclusion that any error associated with her hospital statement was harmless beyond a reasonable doubt.

discretion, this court will not reverse a trial court for admitting photographs into evidence. *Baker v. State*, 334 Ark. 330, 974 S.W.2d 474 (1998).

We conclude that there was no abuse of discretion in allowing these photographs into evidence. The two autopsy photographs (Photographs 32 and 34) assisted the medical examiner in explaining cause of death. Photograph 10 was a closeup of the puncture wound made by the needle in Justin's neck, and Photograph 7 was a closeup picture of the two victims in Riggs's bed taken at a different angle. The two photographs could have aided the jury in understanding the crime scene and the condition of Justin's body when police officers found the victims.

Riggs, as a final point, focuses on the fact that the trial court never did a probative-prejudicial weighing with respect to the photographs. Riggs, however, never asked the trial court to do this. Again, we will not reverse a trial court for failing to do what it was never asked to do. *Gooden v. State*, 321 Ark. 340, 902 S.W.2d 226 (1995). It seems to us that it was incumbent on defense counsel to request such a weighing if it considered such to be important or legally required. There was no abuse of discretion on this point.

*V. Rule 4-3(h) Review.*

Though not raised by Riggs, the State brings to this court's attention the point that Riggs sought the death penalty in the penalty phase of her trial and did not contest her death sentence on appeal. Following the penalty phase, the jury unanimously determined, as an aggravating circumstance, that Riggs had caused the death of more than one person in the same criminal episode. With regard to mitigating circumstances, the jury unanimously found that Riggs had no significant history of criminal activity and that she has abilities that would make her a productive member of society, even in prison. The jury also determined that there was some evidence presented to support the fact that the murders were committed while Riggs was under extreme mental or emotional disturbance, but that the evidence was insufficient to prove a mitigating circumstance. The jury then concluded that the aggravating circumstances outweighed the mitigating circumstances and that this justified death by lethal injection. Thus, it is clear that the jury conducted

the appropriate weighing of aggravating and mitigating circumstances and made its conclusion, as required by Ark. Code Ann. § 5-4-603 (Repl. 1997).

Riggs initially waived any appeal of her judgment of conviction, and we ordered that a mental determination pursuant to *Franz v. State, supra,* be made of her ability to choose death. *See Riggs v. Humphrey, supra.*

After our order, Riggs decided to appeal her conviction on two counts of capital murder but declined to raise issues related to her death sentence. The question, then, is whether her decision on this point constitutes a partial waiver of appeal and a choice of death, which necessitates a *Franz* hearing.

We think not. Riggs has mounted a significant appeal relating to the guilt phase of her trial. Thus, she has appealed the judgment against her, although she chose not to raise issues associated with her death sentence, just as she did not at the trial level.

We are further mindful of the fact that under Ark. R. Crim. P. 37.5, as we have interpreted it, Riggs will be entitled to a *Franz* hearing should she waive her right to postconviction relief. *See Willett v. State,* 337 Ark. 457, 989 S.W.2d 508 (1999) (*per curiam*). Thus, if Riggs decides not to pursue her postconviction remedies, as her counsel stated at oral argument, she will be afforded a *Franz* hearing. In sum, we do not believe that a *Franz* hearing is warranted at this time under these facts.

The record has been reviewed for other reversible error pursuant to Supreme Court Rule 4-3(h), and none has been found.

Affirmed.

THORNTON, J., dissents.

RAY THORNTON, Justice, dissenting. As the majority points out, Ms. Riggs was held in custody at the hospital from the time she was admitted until the time she gave the statement. During this time, she was not permitted to visit with her family, and her attorney was denied access to her in the hospital. Both her family and her attorney notified the Sherwood Police that she was represented by counsel, and the police recognized this. Notwithstanding the assurances from two officers that they would

not question Ms. Riggs, two other officers reported to duty and proceeded to interrogate her. Ms. Riggs' statement was delusional and incoherent, and was terminated only when she asked the police officer if his mother had trouble with the escalator. There was no escalator in the hospital.

Under these circumstances, I differ with the majority on the question of whether her statement was given voluntarily, intelligently, or knowingly. For that reason, I respectfully dissent.