Darrell PILCHER *v.* STATE of Arkansas

CR 02-549                                                    136 S.W.3d 766

Supreme Court of Arkansas
Opinion delivered December 11, 2003

[Petition for rehearing denied January 15, 2004.*]

---

* DICKEY, C.J., not participating.

*Jo Kelly Hardin*, for appellant.

*Mike Beebe*, Att'y Gen., by: *David R. Raupp*, Sr. Ass't Att'y Gen., for appellee.

R AY THORNTON, Justice. Appellant, Darrell Pilcher, was convicted of capital murder and sentenced to life imprisonment without the possibility of parole for the murder of Carolyn Farley. In November 2000, Carolyn Farley disappeared. During an investigation of her disappearance, law enforcement officials questioned appellant, who had been romantically linked to Ms. Farley. After questioning, appellant led the law enforcement officials to Ms. Farley's body, but denied that he had murdered her. Upon further questioning, appellant admitted that he had stabbed Ms. Farley numerous times, tied cement blocks to her body, and attempted to conceal the body. On November 30, 2000, a criminal information was filed charging appellant with capital murder.

In a motion filed on November 2, 2001, and through oral motions raised during pretrial hearings, appellant sought to suppress statements made while he was in custody. The trial court held a *Denno* hearing on each of appellant's in-custody statements, and concluded that the statements were voluntarily given. Specifically, it concluded that the statements were made after appellant voluntarily waived his rights, and that the statements were not given in response to improper police compulsion, promises, or inducement.

Appellant's trial was held in the Hot Spring County Circuit Court. During the trial, appellant testified that he had murdered Carolyn Farley. In addition to appellant's judicial confession, other evidence directly linking appellant to Ms. Farley's death was

introduced at trial. After considering the evidence, the jury found appellant guilty of capital murder.

During the sentencing phase of appellant's trial, the jury heard additional testimony and arguments. Thereafter, the jury sentenced appellant to life imprisonment without the possibility of parole.

It is from this conviction that appellant appeals.[1] On appeal, appellant does not challenge the sufficiency of the evidence upon which his conviction is based, and in his judicial confession, he testified that he stabbed Carolyn Farley twenty-two times, tied cement blocks to her body, and attempted to hide the body. Based upon the evidence presented at trial, we conclude that there was sufficient evidence to support the conviction. We affirm the trial court's denial of appellant's motions to suppress, and we affirm appellant's conviction.

On appeal, appellant contends that the trial court erred when it denied his motions to suppress statements made to law enforcement officials. Specifically, appellant argues that these statements should have been suppressed because they were not voluntarily given. Appellant argues that his statements were made in response to improper police coercion and offers of false promises.[2]

In *Cox v. State*, 345 Ark. 391, 47 S.W.3d 244 (2001), we outlined our standard for reviewing the voluntariness of statements resulting from police interrogation. We explained:

> We have said that statements made while in police custody are presumed to be involuntary and the burden rests on the State to prove their voluntariness and a waiver of *Miranda* rights by a

---

[1] On May 22, 2003, we issued a *per curiam* opinion ordering appellant's attorney, Joe Kelly Hardin, to file a new brief in appellant's case because we concluded that the brief that was filed on behalf of Mr. Pilcher was woefully deficient. *See Pilcher v. State*, 353 Ark. 357, 107 S.W. 3d 172 (2003). Mr. Hardin complied with our order and filed a new brief on June 26, 2003.

[2] In its brief the State argues, "it is not clear . . . that the appellant preserved a Fifth Amendment coercion argument with respect to any statement by specifically making that argument below." After reviewing the record, we conclude that appellant adequately challenged the voluntariness of his statement below and that the trial court, who held a *Denno* hearing, was fully aware of appellant's arguments and was able to make findings sufficient enough for our review.

preponderance of the evidence. *See Rychtarik v. State*, 334 Ark. 492, 976 S.W.2d 374 (1998); *Smith v. State*, 334 Ark. 190, 974 S.W.2d 427 (1998). In determining voluntariness, this court looks to whether the statement and waiver were the result of free and deliberate choice rather than coercion, intimidation, and deception. *Rankin v. State*, 338 Ark. 723, 1 S.W.3d 14 (1999); *Smith v. State, supra, citing Colorado v. Spring*, 479 U.S. 564 (1987) and *Moran v. Burbine*, 475 U.S. 412 (1986). On appeal, this court makes an independent determination of the voluntariness of a confession, but in doing so, we review the totality of the circumstances and will reverse only when the trial court's finding of voluntariness is clearly against the preponderance of the evidence. *See Jones v. State*, 323 Ark. 655, 916 S.W.2d 736 (1996); *Trull v. State*, 322 Ark. 157, 908 S.W.2d 83 (1995). We recognize in our determination of whether a trial court's finding is clearly erroneous that conflicts in testimony are for the trial court to resolve. *See Jones v. State, supra.* Where it is apparent from the record that a statement is not the product of an accused's free and rational choice and where the undisputed evidence makes clear that the accused did not want to talk to police detectives, the Supreme Court has held that due process of law requires that the resulting statement not be used against the accused. *Mincey v. Arizona*, 437 U.S. 385 (1978).

\* \* \*

This court has also consistently held that relevant factors in determining whether a confession was involuntary are age, education, and the intelligence of the accused as well as the lack of advice as to his constitutional rights, the length of detention, the repeated and prolonged nature of questioning, and the use of mental or physical punishment. *See, e.g., Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998); *Davis v. State*, 330 Ark. 76, 953 S.W.2d 559 (1997).

*Cox, supra (citing Riggs v. State*, 339 Ark. 111, 3 S.W.3d 305, (1999)); *see also Grillot v. State,* 353 Ark. 294, 107 S.W.3d 136 (2003). Other relevant factors in considering the totality of the circumstances include the statements made by the interrogating officer and the vulnerability of the defendant. *Hood v. State*, 329 Ark. 21, 947 S.W.2d 328 (1997).

In accordance with our standard of review, we turn now to the issues before us. Appellant argues that his statements were not voluntary because they were made in response to police coercion. Specifically, appellant argues that law enforcement officials threatened to prosecute his parents and that this coercion induced his statements. To determine whether appellant's statements were obtained by the use of improper police threats, we look to the facts surrounding the giving of appellant's statements. At the suppression hearing, Sheriff Mark Collie was questioned about the alleged coercion during the following colloquy:

> SHERIFF MARK COLLIE: [I] told him [appellant] that I was going to be in the office about thirty-three more days, that the city police was convinced that she [Carolyn Farley] might be out there around his parents' property and that, you know, if there were anything going on out there that he needed to tell me because he didn't need his parents involved in something that he done.

> PROSECUTING ATTORNEY: What happened when you said that?

> SHERIFF COLLIE: He basically said that how could they [appellant's parents] be, you know, be in any kind of problem and I explained to him that, you know, if they knew anything or were covering up for him in any way that he could be, his parents could be charged along with him at one level below whatever crime that he was charged with, and that his parents didn't need those kind of problems. And he needed to just shoot straight with me and we would, you know, recommend to the prosecutor a number of years versus, you know, getting charged with life in prison or something.

> PROSECUTOR: What did he do?

> SHERIFF COLLIE: At that point he wanted to, you know, go into a little more detail as to, you know, if he would of, you know, have to talk to the city because he didn't like the city and he wasn't going to tell them anything. And I told him, you know, that I'd shoot straight with him. I couldn't make any promises, you know but all I could do was recommend to the prosecutor's office whether or not he cooperated and told us the truth.

> PROSECUTOR: What did he do then?

SHERIFF COLLIE:   He told me that if I'd sign him out he would take me to where she was at.

\* \* \*

DEFENSE ATTORNEY:   So did you imply to him that his parents would become more so involved if he didn't, in fact, waive his rights and speak to you on this matter?

SHERIFF COLLIE:   No, sir. I explained to him that if his parents knew what had happened to Carolyn Farley and were helping hide what transpired that they could be charged with hindering along with him.

DEFENSE ATTORNEY:   Did you advise him of this fact in order to encourage him to speak with you?

SHERIFF COLLIE:   · I advised him that he needed to, if he wanted me to help his parents he needed to talk to me. But the only way I could help anyone would be if he told the truth.

DEFENSE ATTORNEY:   Did you tell him that you would help his parents if he talked to you?

SHERIFF COLLIE:   I told him that I would try to keep them from being charged if they were not involved.

A review of Sheriff Collie's testimony does not reveal improper police coercion, but rather shows that Sheriff Collie was attempting to appeal to appellant's sympathies when he discussed the possibility of prosecuting appellant's parents. We have approved the use of such "psychological tactics" in several cases. In *Hood v. State*, 329 Ark. 21, 947 S.W.2d 328 (1997), we were asked to review a custodial statement to determine whether it was voluntarily given. The challenged statement was given during an interrogation in which law enforcement officials had threatened to arrest Hood's wife, who was in the hospital. After reviewing the totality of the circumstances, we held:

> As to the officers' appeal to Hood to consider the health of his wife and the threat of her arrest, we have observed that the police may, without violating an accused's rights, attempt to play on his sympathies or explain to him that honesty is the best policy,

provided that the accused's decision to make a custodial statement is voluntary in the sense that it is the product of the accused's exercise of his free will. *Id.*; *see also Misskelley, supra* (police may use some psychological tactics in eliciting a custodial statement from an accused). Although the interrogating officers' statements were obviously intended to influence Hood, we are unable to say that they were improper or contrary to basic notions of fairness, or that they procured an untrue statement.

*Hood, supra.*

Additionally, in *Rankin v. State*, 338 Ark. 723, 1. S.W. 3d 14 (1999), a criminal defendant alleged that law enforcement officials told him during the interrogation that his brother and mother were going to be held at the police station until he gave an incriminating statement, and that such threats caused him to give an incriminating statement. In affirming the trial court's denial of Rankin's motion to suppress, we held:

> Even if Mr. Rankin's testimony were believed by the trial court, the police may use some psychological tactics and coercive statements in eliciting a custodial statement from the accused so long as the means employed are not calculated to procure an untrue statement, and the accused's free will is not completely overborne.
>
> * * *
>
> In this case, Mr. Rankin decided to give his confession right after Detectives Cooper and Addison showed him the murder weapon. Under these circumstances, we are unable to say that Mr. Rankin's free will was completely overborne by any alleged threat to detain his mother and brother, or that such a threat procured an untrue statement.

*Rankin, supra* (internal citations omitted).

From the evidence presented at the suppression hearing in this case, it does not appear that appellant's free will was completely overborne by Sheriff Collie's tactics so as to render his custodial statements involuntary. Additionally, the evidence does not show that there was an attempt to procure an untrue statement.

■ Turning to an examination of appellant's vulnerability, we note that appellant was thirty-nine years old at the time the interview was conducted. He had a high-school education and could read and write. Sheriff Collie testified that prior to interviewing appellant, he read appellant his *Miranda* rights, and appellant signed a form waiving those rights. Sheriff Collie further explained that appellant had been incarcerated for several weeks on a separate criminal charge at the time the interrogation was conducted. Notwithstanding the fact that appellant testified that he did poorly in school, there was no evidence that established that appellant was mentally retarded or had a below-normal-intelligence level. Based on the totality of the circumstances, we cannot say that the trial court's finding of voluntariness is clearly against the preponderance of the evidence.

■ Next, appellant argues that law enforcement officials induced his statements with false promises. Specifically, he argues that law enforcement officials promised him a lesser sentence in exchange for his statements. A statement induced by a false promise of reward or leniency is not a voluntary statement. *Bisbee v. State*, 341 Ark. 508, 17 S.W.3d 477 (2000). For the statement to be involuntary, the promise must have induced or influenced the confession. *Id.* As with other aspects of voluntariness, we look at the totality of the circumstances. *Conner v. State*, 334 Ark. 457, 978 S.W.2d 300 (1998). The totality is subdivided into two main components: first, the statement of the officer, and second the vulnerability of the defendant. *Bisbee, supra.*

With regard to appellant's contention that Sheriff Collie offered him false promises of leniency in exchange for his statements, the following colloquy is relevant:

DEFENSE ATTORNEY: And you told him that if he told you the truth you would make a recommendation to the prosecutor that he be offered a term of years in this case?

SHERIFF COLLIE: I told him that all we could do was make a recommendation. We couldn't make any promises but, you know, we could, if he was truthful with us and told us everything that we would tell the prosecutor that he cooperated and, you know, maybe give him a number of years instead of a death sentence. But it all depended on whether or not he was truthful with us.

DEFENSE ATTORNEY:   And I take it you never made such a recommendation?

\* \* \*

SHERIFF COLLIE:   I advised the prosecutor's office that eventually he did, you know, cooperate and finally did tell us the truth. But as far as a number of years, you know, at that point I didn't even know what charge was going to be filed against him.

\* \* \*

DEFENSE ATTORNEY:   My question is did you ever make such a recommendation to the prosecutor?

SHERIFF COLLIE:   I don't recall exactly what, you know, we did do as far as the prosecution. After that we basically told them what all happened and, you know, that his parents were not involved. But as far, if I said a number of years I don't recall exactly saying, asking or if we agreed on a number of years. I don't remember ever asking them for a number of years.

DEFENSE ATTORNEY:   You don't remember ever making a recommendation to the prosecutor's office that Mr. Pilcher be offered a term of years as opposed to the other two penalties?

SHERIFF COLLIE:   I think the only thing I ever said was if you come up with a number of years, you know, he may plead without a trial.

DEFENSE ATTORNEY:   But you didn't make the recommendation?

SHERIFF COLLIE:   I just told them that he cooperated with us.

A review of Sheriff Collie's testimony shows that he informed appellant that he could not promise a reduced sentence, but that he could recommend to the prosecutor a sentence for a term of years if appellant was truthful. We have approved the use of such promises in other cases. *See Cox v. State*, 345 Ark. 391, 47 S.W.3d 244 (2001) (holding that a statement was not rendered involuntary when a law enforcement official told the criminal defendant that if he told the truth the officer would inform the prosecutor that he had cooperated); *see also Williams v. State*, 338 Ark. 97, 991 S.W.2d 565 (1999). Additionally, we note that Sheriff

Collie informed the prosecutor's office that appellant had cooperated with law enforcement officials.

Kirk McClennahan was present during appellant's interrogation. At the suppression hearing, he testified that he agreed with Sheriff Collie's rendition of the facts. Mr. McClennahan further testified that he recommended to the prosecutor's office that appellant "not be given the death sentence."

Based on the totality of the circumstances, we conclude that Sheriff Collie was not offering appellant false promises of a reduced sentence in exchange for his statements, but was merely advising appellant that if he cooperated with law enforcement officials and told the truth, then he would tell the prosecutor that appellant had cooperated. Sheriff Collie did not assert that leniency would flow from appellant's telling the truth, and in fact, Sheriff Collie reminded appellant that he could not grant appellant leniency. Accordingly, we conclude that appellant has failed to establish that his statements were made in response to a false promise of leniency.

After considering appellant's allegations, and the totality of the circumstances, we cannot say that the trial court's finding that appellant's statements were voluntarily given was clearly against the preponderance of the evidence.

In a separate point on appeal, appellant argues that the statements that he made to law enforcement officials were obtained in violation of the Sixth Amendment and should have been suppressed. Appellant argues that the statements were obtained in violation of the Sixth Amendment because he was represented by an attorney at the time the police interview was conducted, but the law enforcement officials failed to notify the attorney of the interview.

Amendment 6 to the United States Constitution provides:

> In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and caused of the accusation, to be confronted with the

witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

*Id.* In *McNeil v. Wisconsin*, 501 U.S. 171 (1991), the United States Supreme Court addressed the protection afforded to criminal defendants by the Sixth Amendment. The Court explained:

> The purpose of the Sixth Amendment counsel guarantee — and hence the purpose of invoking it — is to "protec[t] the unaided layman at critical confrontations" with his "expert adversary," the government, after "the adverse positions of government and defendant have solidified" with respect to a particular alleged crime.

*McNeil, supra.* In *McNeil*, the Court further explained:

> The Sixth Amendment right . . . is offense-specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, " 'at or after the initiation of adversary judicial criminal proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *United States v. Gouveia*, 467 U.S. 180, 188 (1984) (*quoting Kirby v. Illinois*, 406 U.S. 682, 689 (1972) (plurality opinion)). And just as the right is offense-specific, so also its . . . effect of invalidating subsequent waivers in police-initiated interviews is offense-specific.
>
> > "The police have an interest . . . in investigating new or additional crimes [after an individual is formally charged with one crime.] . . . [T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. . . ."

*Maine v. Moulton*, 474 U.S. 159, 179-180 (1985).

> > "Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses."

*Id.*, at 180, n. 16.

*McNeil, supra; see also Olive v. State,* 340 Ark. 343, 10 S.W.3d 443 (2000).

■ Mindful of the relevant constitutional principles, we turn now to a review of the facts surrounding appellant's interview with law enforcement officials. At the time of the first interview, appellant had an attorney that was appointed to represent him on a battery charge. The battery charged involved Ms. Farley. After her disappearance, law enforcement officials questioned appellant. According to Sheriff Mike Collie, the purpose of the interview was to "find out where Carolyn Farley was and what happened to her." During the interview, appellant discussed the facts surrounding the battery charge. Appellant's attorney was not present during this discussion. However, we note that at the time of the interview, appellant was not charged with any crime relating to Ms. Farley's disappearance or murder. Thus, his Sixth Amendment right to counsel, which is offense-specific, had not yet attached, and law enforcement officials were not required to notify appellant's attorney prior to interviewing appellant about Ms. Farley's disappearance or murder.

■ Appellant also asserts that because his attorney was not present during the interview, the statements relating to the battery charge were erroneously used as an aggravating circumstance in his trial for the murder of Ms. Farley.[3] Appellant has failed to establish that the admission of the statements, which led to the aggravating circumstance, caused him to suffer prejudice. Specifically, he has failed to establish that the alleged error was prejudicial because he received a sentence of life imprisonment rather than the death penalty. *See Hogan v. State,* 281 Ark. 250, 663 S.W.2d 726 (1984) (holding that a criminal defendant suffered no prejudice as the result of the trial court's admission of a prior criminal offense as an aggravating circumstance because the jury fixed the criminal

---

[3] The verdict form stated:

We the jury after careful deliberation have unanimously determined that the State has proven beyond a reasonable doubt the following aggravating circumstance:

Darrell Piltcher previously committed another felony, an element of which was the use of threat of violence to another person or creating a substantial risk of death or serious physical injury to another person.

defendant's punishment at life imprisonment without parole rather than death). Because appellant failed to establish that the admission of the challenged aggravating circumstance caused him to suffer prejudicial harm, we need not give this issue further consideration.

■ In a final point on appeal, appellant argues that we should apply the "fruit of the poisonous tree" doctrine to exclude various statements that he gave to law enforcement officials. The "fruit of the poisonous tree" doctrine provides that evidence obtained by the exploitation of a primary illegality must be excluded. *See Wong Sun v. United States*, 371 U.S. 471 (1963). In the case now before us, appellant was interviewed by law enforcement officials on three separate occasions. On appeal, he argues that the first statement that he gave to law enforcement officials was obtained in violation of the Fifth and Sixth Amendments. Based on this argument, he further contends that the evidence obtained and the two additional statements given were also unconstitutional as fruits of the poisonous tree. Because we have concluded that appellant's first statement was not unconstitutionally obtained, the two subsequent statements were properly admitted.

■ Having concluded that the trial court did not err, we note that even if there had been an error in denying appellant's motions to suppress, we have held that such an error may be rendered harmless when the appellant testifies at his trial and restates under oath the crucial portions of the challenged pretrial statements. *See Isbell v. State*, 326 Ark. 17, 931 S.W.2d 74 (1996). At trial, appellant testified that he stabbed Carolyn Farley twenty-two times, tied cement blocks to her body, and used leaves, tires, and trash bags in an attempt to conceal the body. Such a judicial confession would have cured any error in refusing to suppress appellant's custodial statements. However, we conclude that the trial court did not commit error in refusing to suppress appellant's custodial statements.

### 4-3(h) Review

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to appellant, and no error has been found.

Affirmed.

ARNOLD, C.J., not participating.